**FALWELL et al. v. UNITED STATES et al.**

Civ. No. 168.

District Court, W. D. Virginia, at Lynchburg.

Dec. 21, 1946.

Judgment Affirmed March 31, 1947.

See 67 S.Ct. 1087.

W. G. Burnette and John D. Easley, both of Lynchburg, Va., for plaintiffs.

Wendell Berge, Asst. Atty. Gen., and Edward Dumbauld, Sp. Asst., to the Atty. Gen., for the United States.

Daniel W. Knowlton, Chief Counsel, and Nelson Thomas, Atty., both of Washington, D. C., for the Interstate Commerce Commission.

J. Ninian Beall, of Washington, D. C., for Brooks Transportation Co., and Lucian H. Cocke, Jr., of Roanoke, Va., for N. & W. Ry. Co. et al., intervenors.

Before DOBIE, Circuit Judge, and PAUL and BARKSDALE, District Judges.

PAUL, District Judge.

The plaintiffs in this suit are Falwell Fast Freight, Inc., a Virginia corporation engaged in business as a common carrier of property in interstate commerce by motor vehicle, with its headquarters at Lynchburg, Va., and C. W. Falwell, Jr., owner of a controlling interest in the corporation. The controversy arises out of the desire and attempt of the plaintiffs to purchase certain operating rights of two other carriers engaged in similar businesses, these being Evans Line, Inc., of Roanoke, Va. (hereinafter referred to as Evans) and W. B. Draper, doing business as Draper Motor Service, also of Roanoke. The object of the present suit is to set aside and enjoin the enforcement of an order entered by the Interstate Commerce Commission under date of January 14, 1946, in so far as that order denied to plaintiffs authority to acquire certain of the operating rights of Draper.

The background of facts upon which resort is had to this court is as follows:

Prior to July 31, 1944, Evans was the owner of operating rights over regular routes extending from Roanoke west to Bluefield, West Virginia, and thence north to Charleston and Point Pleasant in that state, including various intermediate points.

Draper was owner of a certificate authorizing operations over irregular routes between Roanoke on the one hand and, on the other, Lynchburg, Norfolk, Richmond and other points in Virginia as well as to various points in other states, north and south.

Falwell, the plaintiff here, held a certificate authorizing operations over a regular route between Lynchburg and New York, via Washington, Baltimore and Philadelphia and serving intermediate points; and over irregular routes to specified points and areas in Virginia and various other states. As usual, the certificates held by all of these parties contained limitations or exceptions as to the nature of the commodities to be hauled.

In this situation an agreement was entered into on July 19, 1944, between Falwell and Evans (which was in financial difficulties) whereby Falwell agreed to purchase all of the operating rights of Evans. Falwell also made an agreement with Draper, the date of which does not appear, to purchase from Draper that portion of the latter's rights which authorized operations over irregular routes between Roanoke and Lynchburg. Having made these agreements, the carrying out of which was subject to the approval of the Interstate Commerce Commission, Falwell, Draper and Evans, on July 31, 1944, filed their joint application before the Commission seeking authority under Sect. 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5, to consummate the transfer to Falwell of the rights described.

Shortly after this application was filed the Commission, on August 26, 1944, under authority of Sect. 210a (b) of the Interstate Commerce Act, 49 U.S.C.A. § 310a (b), granted approval for temporary leases by Falwell of the rights sought to be acquired, these leases to expire February 21, 1945. Thereafter, and after notice given, a hearing upon the application for approval of the purchases was held before an examiner of the Commission at Roanoke, Va., on January 25, 1945. The notice for this hearing specifically stated that, since the application contained no request for issuance of operating authority greater than the sum of the existing operating rights of the parties, no request for issuance of any enlarged operating authority would be entertained at the hearing. At this hearing Brooks Transportation Company, a motor vehicle carrier operating within the territory covered by the rights involved in the application, appeared as a

protestant. Certain railroad carriers also appeared in opposition to the application. At this hearing evidence, both oral and documentary, was received, including that offered by the plaintiffs. Thereafter, on February 22, 1945, Division 4 of the Commission entered a report and order in which it granted the application in full, with one of the commissioners dissenting.

Inasmuch as plaintiffs have laid stress upon certain terms of the order of February 22, 1945, it seems well to quote those provisions which they have so emphasized and upon which they, in large part, rest their present contentions. Omitting the heading, preliminary recitations and portions of the order not pertinent to this controversy, this order reads:

"It is ordered, That purchase by Falwell Fast Freight, Incorporated, of Lynchburg, Va., of certain operating rights of W. B. Draper, doing business as Draper Motor Service, of Roanoke, Va., and of operating rights of Evans Line, Inc., also of Roanoke, and acquisition of control of said operating rights by C. W. Falwell, Jr., also of Lynchburg, through said purchase be, and they are hereby, approved and authorized, subject to the terms and conditions set out in the findings in said report.

"It is further ordered, That petition of Falwell Fast Freight, Incorporated, requesting extension of its present lease authority beyond February 21, 1945, be, and it is hereby, denied.

"It is further ordered, That, if the parties to the transactions herein authorized desire to consummate same, they shall (1) notify this Commission, in writing, of the intended consummation date, (2) promptly take such steps as will insure compliance with sections 215 and 217 of the Interstate Commerce Act, and with rules, regulations, and requirements prescribed thereunder, and (3) confirm in writing to the Commission, immediately after consummation, the date on which consummation has actually taken place.

"It is further ordered, That unless the authority herein granted is exercised within 30 days from the date hereof, this order shall be of no further force and effect,

with respect to the authority not exercised."

On the same day (Feb. 22, 1945) that the above order was issued, counsel for Falwell was notified by a telegram from the Commission's office of the favorable action of Division 4; and later on the same day received another telegram (apparently sent in response to one from him) repeating the information contained in the first, with the additional information that the Commission had been advised by the protestant that a petition for reconsideration would be filed.

On March 9, 1945, the protestant, Brooks Transportation Company, filed a petition for reconsideration of the report and order of Division 4 and after consideration of this petition the full Commission, by an order of May 7, 1945, ordered that the report and order entered by Division 4 on February 22, 1945, be reopened for reconsideration. In the meanwhile, by letter dated March 15, 1945, which was after the petition for reconsideration had been filed but before it had been acted on, Falwell informed the Commission that his purchase of the Draper and Evans rights had been consummated on February 22, 1945. This was apparently in compliance with that provision of the order of February 22, 1945, which directed that the Commission be notified of the date when the sale was consummated. However, Falwell's letter recognized the existence of the petition for reconsideration filed by Brooks Transportation Company by stating that final payment to Evans had been deferred until a decision by the Commission on the petition for reconsideration.

Following its order of May 7, 1945, granting reconsideration the matter was considered by the full Commission until January 14, 1946. During this time, (on July 31, 1945) the plaintiffs asked leave to enlarge their application so as to pray for authorization for regular-route operations between Roanoke and Lynchburg but this motion was promptly denied. (August 11, 1946.) As a result of the reconsideration by the full Commission it entered a report and order on January 14, 1946, in which it ordered that so much of the order

of February 22, 1945 (the order of Division 4) as related to the purchase by Falwell of the Evans rights should remain in full force and effect, but that the application by Falwell to purchase the Draper rights was denied. In other words, the action of the full Commission was to approve the purchase by Falwell of the Evans rights but to disapprove the purchase of the Draper rights. Upon entry of this order of January 14, 1946, the Commission directed that the Draper rights, which plaintiffs had been operating under the temporary lease and under the order of Division 4, be returned to Draper as soon as possible. Later, upon application of the plaintiffs, the Commission refused a rehearing but did by several successive orders grant extensions of the time when the order of January 14, 1946, should become effective. While the last of these extensions was effective the plaintiffs instituted this suit.

The purpose of the suit is to set aside and annul the Commission's order of January 14, 1946, and the sole matter in controversy relates to the refusal of the Commission to permit Falwell to acquire that portion of the rights owned by Draper which authorize operations over irregular routes between Roanoke and Lynchburg.

### Discussion

In support of their prayer that the order complained of be set aside and its enforcement enjoined the plaintiffs urge three principal reasons. None of them, in our opinion, justify the court in granting the relief prayed for.

(1) In the first place it is contended that the report and order of Division 4, of February 22, 1945, constitute in fact and in substance a certificate of public convenience and necessity, which is not subject to review or reconsideration but which may be terminated only in accordance with Sect. 212(a) of the Act, 49 U.S.C.A. § 312(a), providing procedure for the suspension or revocation of certificates, permits and licenses. The argument advanced in support of this view is somewhat involved but careful consideration of it does not permit us to accept its conclusion.

The petition filed by the plaintiffs before the Commission was not an application for a certificate of public convenience and necessity under Sects. 206 and 207 of the Act, 49 U.S.C.A. §§ 306 and 307. On the contrary it was an application for approval by the Commission of the proposed purchase by and transfer to one operator of rights then held by another. This is provided for by Sect. 5(2) (a), of the Act, 49 U.S.C.A. § 5(2) (a), wherein such purchases are made lawful "With the approval and authorization of the Commission, as provided in subdivision b". Subdivision b provides that authority for such proposed transactions shall be sought by an application filed before the Commission and provides for the ensuing procedure thereon. The petition filed by the plaintiffs stated that they were proceeding under these provisions of the statute.

So far as appears from the record before us, the matter followed the usual and prescribed course. A hearing was had before an examiner at which evidence was taken and at which other interested parties appeared as protestants. Acting presumably upon the strength of the examiner's report and its own consideration of the facts Division 4 approved the application of the plaintiffs as set out in its order of February 22, 1945. But this was not a final or irrevocable action. Sect. 17 of the Act, 49 U.S.C.A. § 17, which, among other things, deals with Commission procedure and the division of the members of the Commission into Divisions provides (in Sect. 17(6) that any decision, order or requirement made by the Commission, a division, an individual Commissioner or a board shall, on application therefor, be subject to rehearing or reconsideration under such rules as the Commission may determine. And Sect. 17(7) provides that after such rehearing or reconsideration of the decision or order of a division or of an individual Commissioner, the Commission may reverse, change or modify the same.

The action of Division 4 was always, by the clear terms of the statute, subject to reconsideration by the full Commission, provided application was made therefor

within the time prescribed by the rules of the Commission—which was done. The plaintiffs not only were affected with notice of the terms of the statute but, on the same day that Division 4 entered its order, they received actual notice that an application for reconsideration was contemplated. It is true that the order of Division 4 was definite in its terms of approval of the proposed transaction and in its directions to the plaintiffs. It had to be; for the reason that if no reconsideration of it were to be sought, it would have embodied the terms on which the plaintiffs were to proceed and with which they would have had to comply. But any action which the plaintiffs took toward carrying out the provisions of the order was, as they well knew, subject to what might happen if, as a result of reconsideration by the full Commission, the order was reversed or modified.

In view of the plain terms of the statute and the evident regularity of the procedure in compliance therewith, we see no justification for the contention that the order of February 22, 1945, was in effect a certificate of public convenience and necessity terminable only by a proceeding under Sect. 212(a) of the Act. The plaintiffs contend that they consummated the purchase of the Draper rights on February 22, 1945, and the implied argument is that having relied on the order of Division 4 and complied with it, it would be inequitable to permit disturbance of this completed transaction. It will be noted that this date is that on which the report and order of Division 4 was handed down. It may be that the parties were able to complete their transaction within these few hours. Inasmuch as plaintiff had been for some time operating the Draper rights under lease it is possible that the transition from lease to ownership was merely nominal. On the other hand the notice to the Commission of this consummation of purchase was not until March 15th, about a week after the formal application for reconsideration had been filed by the protestant; and it may be that plaintiffs thought their position would be strengthened by showing a completed transaction ante-dating the application for

reconsideration. Whichever be the case, it is clear that the plaintiffs could not oust the jurisdiction of the Commission to grant reconsideration merely by hastening to comply with the order of Division 4 before the protestant could file its application for reconsideration. To permit this would be to nullify the provisions of the statute. It is to be noted also that when this matter was before the full Commission on reconsideration the plaintiffs, so far as appears from the record before us, at no time objected to the validity of the reconsideration or contended that the order of Division 4 occupied the status of a certificate. This argument appears for the first time in this court.

2. The second and third objections advanced against the Commission's order of January 14, 1946, seem to be closely related and may be discussed together.

The action of the full Commission in denying to plaintiffs the acquisition of the Draper rights was based on a finding which was in substance that during the period of their lease and thereafter the plaintiffs had been utilizing those rights for the conduct of regular-route operations between Lynchburg and Roanoke; that the plaintiffs intended to use the Draper rights in this manner and for this purpose and that they would not and could not be used in any other way; that if the Draper rights were unified with the already existing regular route operating rights of plaintiffs out of Lynchburg, it would be impossible for plaintiffs to operate irregular-route operations between Lynchburg and Roanoke of the nature contemplated in the original grant to Draper. It found that the purpose of the proposed purchase and its necessary result would be that the plaintiffs would conduct regular-route operations between Lynchburg and Roanoke which at Lynchburg would link up with its existing regular routes out of that city to the north and east and at Roanoke would link up with the regular routes to be acquired from Evans; thereby giving to the plaintiffs continuous regular-route operations from points north and east of Lynchburg to points west and north of Roanoke and passing through both cities. And, after pointing out that the

rights of Draper were radial irregular-route operating rights which had been confirmed to him under the "grandfather" clause, the Commission stated that, "This portion (i. e. that portion sought by plaintiffs) of the radial rights of Draper to and from Roanoke should continue to be a part of the whole, as confirmed under the 'grandfather' clause, if there is to be any possibility of preserving the irregular-route nature of the service authorized." For these reasons, the more detailed recital of which appears in the Commission's report but need not be repeated here, the Commission found that the purchase by plaintiff of the described operating rights of Draper was not shown to be consistent with the public interest.

■ These findings of the Commission are first assailed on the ground that they are erroneous and unfounded and are arbitrary and capricious. So far as this assault relates to the Commission's determination on factual matters developed before it, a sufficient answer lies in the fact that the plaintiffs have not introduced before us any part of the transcript of the evidence taken in the matter and upon which the Commission reached its conclusions. In the absence of knowledge of what this evidence was we have no basis for saying that the findings of the Commission were arbitrary, capricious or without evidence to support them. This is too well settled to permit argument. See Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 693, 78 L.Ed. 1260, where it is stated: "The settled rule is that the findings of the Commission may not be assailed upon appeal in the absence of the evidence upon which they were made. * * *. The findings in the report being thus accepted as true, there is left only the inquiry whether they give support to the conclusion."

■ Nevertheless it may be said that even the present record gives confirmation of the Commission's finding that the proposed purchase would result in the plaintiffs establishing regular-route operations between Lynchburg and Roanoke and was for that purpose. There seems to be no dispute as to that. The plaintiffs have not denied that during the lease from Draper, and since, they have operated these rights in the manner found by the Commission; nor do they aver any intention to operate them otherwise. Indeed the nature of the actual and intended use of the Draper rights by plaintiffs is evidenced by the fact that they sought both before Division 4 and before the full Commission to amend their application so as to request issuance of a certificate to cover specifically the manner in which they had been operating, i. e. a certificate authorizing regular-route operations. And they go further in their tacit admissions of their intentions by arguing before us that the linking of their existing regular-route operations through purchase of the Draper rights would be in the public interest because it would enable them to conduct regular-route operations from New York through Lynchburg and Roanoke and beyond, without interchange.

It seems, however, that plaintiffs' real reason for asserting that the Commission has acted arbitrarily and in an erroneous conception of the law is embodied in their contention that even if plaintiffs intend to operate the Draper rights in the manner found by the Commission the Commission is without power to deny them the right to make this purchase. The nature of this contention is best shown by quotations from plaintiffs' brief, wherein it is stated: "A carrier over regular routes means 'one operating over specified routes between fixed termini as set forth in the carriers certificate' and a carrier over irregular routes means 'one operating within a specified and defined territory as set forth in the carriers certificate but not over a specified route or routes between fixed termini'. Neither the Act nor the regulations of the Commission * * * makes any distinction between an irregular-route carrier and a regular-route carrier except as to the routes over which the operation is conducted. The terms 'regular' and 'irregular' have no reference whatever * * * to any particular schedule of service, quantity of service or quality of service to be rendered by a regular-route carrier and an irregular-route carrier. * * *. A regular-route carrier is limited

in its operation to specified highways, but an irregular-route carrier has no limitations whatever as that carrier is privileged to use any and all highways between the points or within the territory specified in the carrier's certificate and an irregular-route carrier may use the same highway whenever it desires to do so, as neither the Act nor the regulations of the Commission * * * prevents the frequent or infrequent use of any given highway."

This argument, as we understand it, amounts in the end to this: That a certificate for irregular-route operations over a specified territory carries no restrictions as to the highways (or routes) over which the carrier may operate within the territory or between the points specified in his certificate; and that the carrier is likewise under no prescription or restriction as to schedules of service or quantity or quality of service. And that, therefore, the holder of a certificate for irregular-route operations may, if he choose, utilize his rights or any part thereof to establish regularly scheduled operations over any highway within his territory—or in other words, to conduct his operations in the form of regular-route operations between any points covered by his certificate. And this, even if by so doing he parallels the service rendered by any number of other carriers holding regular-route certificates for operations between the same points.

With this contention we cannot agree. To do so would grant to holders of irregular-route certificates a free hand to operate as they chose; to operate irregularly over such parts of the territory as they might choose and to establish regular-route operations where they so desired. An irregular-route certificate would be authority to conduct either or both forms of operation at the carrier's choice. It would nullify the distinction between regular and irregular route carriers and would nullify the power of the Commission to establish and maintain comprehensive and efficient service adjusted to the public need and free from destructive competition between carriers.

The Act itself, Sect. 204(b), 49 U.S.C.A. 304(b), empowers the Commission to establish classifications of motor carriers, and pursuant to this authority the Commission has adopted definitions of the several classes of service, including: "An irregular-route radial-service carrier is any person who or which undertakes to transport property * * * over irregular routes from a fixed base point or points to points or places located within such radial area as shall have been fixed and authorized by the Interstate Commerce Commission in a certificate of public convenience and necessity. * * * or from any point within such radial area to such carrier's fixed base point or points."

It was operations of the sort described in the above definition which Draper had been conducting prior to June 1, 1935, and he procured a certificate for their continuance by virtue of the so-called "grandfather clause."

The Commission has also defined regular-route service as being that "which undertakes to transport property * * * between fixed termini and over a regular route or routes". This is further classified as being a scheduled or a non-scheduled service, dependent upon whether the service is upon a fixed schedule or at intermittent intervals. But the essential feature of any regular-route operations is that it shall be between fixed termini and over a regular route.

That the Commission has authority to make the above classifications and that they are proper distinctions in classes of service which will be recognized has been well settled by the decisions of the courts. See United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162; United States v. Carolina Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971.

In United States v. Maher, supra, as in the instant case, the contention of the carrier was in substantial effect that the right to operate irregularly within a specified territory covered the right, at the will of the carrier, to operate between fixed termini and over regular routes within such territory. The Commission held that

the services were of different nature and the Supreme Court, upholding this finding and giving recognition to the propriety of the difference in classification, said [307 U.S. 148, 59 S.Ct. 771]:

"In differentiating between operations over the 'route or routes' for which an application under the 'grandfather clause' is made as against operations 'within the territory', Congress plainly adopted the familiar distinction between 'any-where-for-hire' bus operations over irregular routes and regular route bus operations between fixed termini."

In the instant case the report of the Commission states:

"The radial irregular-route operating rights of Draper were confirmed under the 'grandfather clause'. The service rendered, and which provided the basis for such confirmation, was a-call-on-demand nonscheduled service to and from Roanoke and the numerous specified points, including an occasional interchange shipment to or from Lynchburg.

   \*      \*      \*      \*      \*      \*

"The use to which vendee would put these irregular-route operating rights would bear little resemblance to that which provided the basis for the confirmation of Lynchburg as one of the points served to and from Roanoke under the 'grandfather clause'. Without passing upon protestant's argument that irregular-route rights between these points were confirmed in Draper under the 'grandfather clause' in error, in our opinion it would be impossible for vendee to conduct irregular-route operations between these two specified points after the unification with its regular-route operations. This portion of the radial rights of Draper to and from Roanoke should be a part of the whole, as confirmed under the 'grandfather clause', if there is to be any possibility of preserving the irregular-route nature of the service authorized."

That it was within the functions of the Commission to make these findings there can be no doubt and there is nothing before us to indicate that its conclusions were arbitrary, capricious or without support in the evidence before it.

■ The plaintiffs supplement such arguments as have been heretofore indicated by a further one to the effect that the Commission's findings as to the intended use of the Draper rights by plaintiffs is an assumption; and that under Sect. 5 of the Act the Commission is required to approve or disapprove the transfer of operating rights as they find them "without assuming whether the carrier can or will operate the acquired rights in a lawful or unlawful way." That only after the consolidation has been effected can the lawfulness of the ensuing consolidated operation be questioned.

So far as the Commission's views as to the manner in which plaintiff would use the Draper rights are charged with being mere assumptions, this argument has little force in face of the fact that it is not denied that ever since plaintiffs leased these rights they have operated them in the manner found and that they desire and intend to so use them if permitted to purchase them, and that they have made at least two attempts to procure from the Commission formal approval of such use.

This argument is no doubt founded on the Old Colony Motor Lines, Inc. case, 39 M.C.C. 143, (cited in the report of Division 4).

In that case an application was made for the purchase of certain irregular-route rights in the Boston and New York areas. The Commission expressed the opinion that, while the vendee intended to continue irregular-route operations in these areas it also intended to utilize the rights to be acquired to establish what amounted to a regular-route service between New York and Boston, which latter service would not be within the scope of the rights acquired. The Commission stated, however, that the vendee was entitled to the presumption that he would operate within the scope of his authority and until he had conducted his unified operations for sufficient length of time to enable a determination of whether he was or was not doing so, any conclusion of an unlawful operation would be premature. It therefore approved the purchase, but with the specific provision that it was not to be

construed as approving regular-route operations under the acquired irregular-route rights.

The difference between the conclusions in the Old Colony case and the instant one is that in the former the Commission, while recognizing the vendee's intentions, believed that, in the absence of any evidence of any unlawful operations actually conducted, the vendee was entitled to the presumption that it would operate within the scope of its authority. In the instant case the Commission has found that the plaintiffs, for an extensive period and ever since leasing the Draper rights, have operated in an unlawful manner, that they intend to continue to do so, and that it is impossible for them to operate otherwise. Any seeming inconsistency in the Commission's holdings in these two cases is no more than the difference between taking one course of action on evidence which is definite, conclusive and undisputed and the refusal to take similar action where the evidence is not conclusive. The difference between a case where the court believes that doubts exist to the benefit of which a party is entitled and which serve to restrain a judgment adverse to him, and a case where there are no doubts to serve in his favor. It is not uncommon for cases having analogous facts to have differing outcomes depending on the nature and the degree of conclusiveness of the evidence.

Sect. 5(2) of the Act, 49 U.S.C.A. § 5(2), dealing with the mergers, leases, purchases, etc., of operating rights specifically provides that they shall be subject to the approval of the Commission. Obviously this approval must be given before the proposed merger or purchase is effected. Nor is it a perfunctory approval which must be given as a mere matter of form in all cases. It clearly is not contemplated, as plaintiffs apparently urge, that the Commission upon request must give approval to any contemplated transfer and wait until after it has been effected before deciding whether it results in a lawful operation and one consistent with the public interest.

There is nothing in the record before us which indicates that the Commission failed to give a fair and thoughtful consideration to plaintiffs' application or which supports the assertion that its findings were arbitrary, irrational and contrary to law. The questions passed on were peculiarly within the function of the Commission and we are unable to see wherein there has been any abuse in the exercise of that discretion which has been entrusted to it by the terms of the statute.

It follows that the complaint should be dismissed and it will be so ordered.