JoNes, Chief Judge,
delivered the opinion of the court:
This is a suit for the refund of Federal income taxes which were paid by the estate of Helen Davison for the years 1953 and 1951. The case concerns certain cash rents which were based on the proceeds of crop production on decedent’s land and certain other rents payable in crops which were attributable to leases that ran during the year 1952. On the date of decedent’s death the amounts of these rents were not ascertained. Thereafter, the estate collected both rents in full and sold the crop-rents for money. The questions presented are whether the rents received in money and the rents received in crops are taxable to the estate as income in respect of a decedent.
The facts have been found by the trial commissioner without exception by either party. The decedent, Helen Davison, was on the cash receipts and disbursements method of accounting. She died on December 24, 1952, owning two parcels of real property. One parcel, 320 acres located in Coolidge, Arizona (hereafter referred to as the Coolidge tract), had been leased by the decedent to one Fred Jones for the period January 1, 1952, to January 1, 1953. The lease provided that the decedent was to be paid as rent “one-fourth of all crops grown” on the 320 acres.
The second parcel of land, 640 acres located in Eloy, Arizona (hereafter referred to as the Eloy tract), had been leased to one Leland Jones and one Mike Jones who later assigned the lease to the Jones Ranch Enterprises Corporation. The term of this lease was from February 1952, to *293 January 1, 1953. It was provided in this lease that the decedent was to be paid as rent “one-half of the net proceeds of all crops grown” on the 640 acres. Each of the leases contained the customary provision that the tenant had the privilege of harvesting the balance of any crops that had not been harvested on the date of the expiration of the lease.
• Up to the date of decedent’s death, the local cotton gin company, on behalf of the lessees of the Coolidge tract and pursuant to that lease, had paid the decedent a total of $6,516.01 as her share of the seed credits and cotton sales for the period May 31, 1952, to October 20, 1952. This amount represented the proceeds from the sale of the decedent’s one-fourth of 129 bales of cotton grown by the lessee.
In February 1953, subsequent to the death of the decedent, the cotton gin company, again on behalf of the lessee of the Coolidge tract, paid the decedent’s estate the amount of $14,137.14, representing the sale price of decedent’s final share of the crops.
The lessee of the 640-acre Eloy tract had made no payments to the decedent prior to her death. But in 1953 the corporation leasing the tract filed two interim statements of settlement for rent due to the decedent’s estate. Both of these statements were rejected by the estate. On January 24, 1954, a settlement was reached between the lessee of the Eloy tract and the estate. It was agreed that the amount of rent due, pursuant to the terms of the lease agreement, was $14,429.43. Between January 27 and February 2, 1954, the estate received this sum from the lessee corporation.
Both the $14,138.14 Coolidge tract rent payment received by the estate in 1953 and the $14,429.43 Eloy tract rent payment received by the estate in 1954 were included as a part of the gross estate of the decedent in Schedule F of the Federal estate tax return filed by the estate. Neither of these two sums was reported as income to the estate. The Commissioner of Internal Revenue adjusted the estate’s income tax return to show each of these amounts received as income in respect of a decedent, and notified the estate that as a result of this adjustment the estate was subject to additional income taxes in the total amount of $11,892.11 plus deficiency *294 interest. The estate was given credit against this additional income tax liability for the estate taxes paid as a result of the inclusion of the rent payments as part of the decedent’s gross estate.
The taxpayer paid the asserted deficiency and filed timely claims for refund of income taxes for the periods 1953 and 1954 in the total amount of $13,728.28. The claims for refund were disallowed and this suit resulted.
The plaintiff maintains that the right to receive these two rental payments was part of the property of the decedent’s gross estate. As such it was properly valued and taxed under the estate tax provisions. The result was that this much of decedent’s property received a new basis in the hands of the estate equal to its estate tax valuation. Since the estate received in satisfaction of these claims for rent an amount which did not exceed the basis of the claims it cannot be said that the estate has received income.
The defendant maintains that the rents received by the estate in cash and in crops, which were immediately sold for its account, represent income in respect of a decedent as set forth in section 126' of the 1939 Internal Revenue Code, 26 IT.S.C. (I.R.C. 1939) §126 (1952 ed.), and section 691 of the 1954 Internal Revenue Code, 26 U.S.C. (I.R.C. 1954) §691 (1952 ed. supp. III). The plaintiff is therefore entitled to a credit for the estate taxes paid on the assessed value of the claims for rent, but the plaintiff is liable for ordinary income taxes on the amounts of rent actually collected.
As set forth above, we must determine whether these rents, both cash and crops, were properly taxed to the estate as income in respect of a decedent.
In order to understand the present state of the law some consideration must be given to its historical background. Prior to 1934 it was held by the courts under the then existing revenue statutes that money earned by a cash method taxpayer and accruable to him on the date of his death but which had not been received by him prior to his death could be collected by his estate without liability for income taxes. Such items were subject to death taxes but they escaped income taxes. Nichols v. United States, 64 Ct. Cl. 241 (1927). *295 A taxpayer on the accrual method of accounting was required to pay income taxes both on what he received and what was accruable to him on the date of his death. This interpretation of the law produced obvious inequities between those who were on the accrual method and those who were on the cash method. In addition, sizable amounts of income which were not “accruable” as the term was then used escaped taxation. Held v. Commissioner, 3 B.T.A. 408 (1926).
The Congress expressed concern over this discrimination and loss of revenue. See Sen. Eep. No. 4558, 73d Cong., 2d Sess. 28 (1934). It provided in section 42 of the Revenue Act of 1934 that the last return of every decedent should include “amounts accrued up to the date of his death.” 48 Stat. 680, 694. While this provision effected an equality between decedents on the cash and accrual methods of accounting, it often resulted in pyramiding into the decedent’s final return large amounts of income which except for death would have been spread over a number of years and subjected to lower rates of tax. See Sen. Rep. No. 1631, 77th Cong., 2d Sess. 100 (1942). In addition, the Supreme Court in Helvering v. Estate of Enright, 312 U.S. 636 (1941) greatly extended the meaning of the phrase “amounts accrued up to the date of his death” beyond any accounting concept of accrual developed by the decisions to that date. Lower court decisions followed taxing to decedents various sorts of inchoate or conjectural gains with the result that the pyramiding was extended and the possibility existed that taxes requiring current cash might be exacted at death on amounts that might never be collected or collected only after many years.
An exceptional case in this period and one of importance to the present decision was Burnett v. Commissioner, 2 T.C. 897 (1943), where the taxpayer during his lifetime had been engaged in the cattle raising business and had kept his books on the cash method. The Commissioner sought to tax to the decedent the value of certain cattle which had been raised by the decedent but which remained unsold at the time of his death. The Commissioner theorized that the cattle represented “gross income” to the decedent which had “accrued up to the date of his death”, and that the amount thereof *296 was properly includable in decedent’s income for the taxable period in which, fell the date of his death. The case was governed by section 42 of the Revenue Act of 1938, 52 Stat. 447, 473, which repeated verbatim the provisions of section 42 of the Revenue Act of 1934, supra. The Board of Tax Appeals held for the taxpayer. It refused to extend the result of the Enright case and stated that in the absence of a sale or exchange there was no gross income accruable to the decedent within the meaning of section 42 merely from the ownership of property. This was so even though the property had been produced by decedent on his ranches during his lifetime. The case was appealed, the appeal was dismissed, and the Commissioner later acquiesced in this part of the decision. 1944 Cum. Bull. 4.
Finally, however, the cumulative evidence of unfairness of section 42 prompted the Congress to eliminate this unpopular provision and to enact in the Revenue Act of 1942, 56 Stat. 798, 831, the provisions of law now effective, namely section 126 of the 1939 Code which survives now as section 691 of the 1954 Code. It was section 126 which first gave rise to the concept of income in respect of a decedent. The differences between the provisions of the 1939 and 1954 Codes are not significant in the instant case, and we shall use the 1939 Code for purposes of our discussion.
Section 126 of the 1939 Code provides in subsection (a) that the “amount of all items of gross income in respect of a decedent” which are not properly includable in the last or a prior return of a decedent shall be taxed as income in the year received to the decedent’s estate or beneficiary actually receiving such amount. Any amounts so received shall be considered to have the same character in the hands of the estate or beneficiary as they would have had in the hands of the decedent if he had lived to receive such amounts. Subsection (b) makes similar provision for certain deductions and credits, and subsection (c) permits an income tax deduction for the estate tax attributable to items taxable under subsection (a).
It is noteworthy that the statute describes how income in respect of a decedent is to be reported, but nowhere does it define precisely what is income in respect of a decedent. At *297 least one attempt has been made to amend the law and supply the missing definition, but the measure failed of enactment. H.E. 3041, 86th Cong., 1st Sess. (1959). The courts which have been called on to construe the statute have not put forth any universal test or definition but have proceeded on a case-by-case basis to establish some dimension to the term. These cases are discussed ahead.
Simultaneously, we must also consider section 113 of the 1939 Code, 26' TJ.S.C. (I.R.C. 1939) § 113 (1952 ed.), which provides that the basis of property acquired by a decedent’s estate shall be the fair market value of such property at the time of such acquisition. This means that any unrealized appreciation in property left by a decedent will escape income taxation on the amount by which the fair market value of the property at the date of decedent’s death exceeds the basis of the property in the hands of the decedent. It is immediately apparent that both section 126 and section 113 cannot apply to the same property. If property gives rise to income in respect of a decedent it is not entitled to a stepped-up basis under section 113. If it is property entitled to the basis adjustment of section 113 it will not be taxed as income in respect of a decedent when it is converted into money. Treas. Eeg. Ill, §29.126-1 (1943), and see 26 TJ.S.C. (I.E.C. 1954) § 1014(c) (1952 ed. supp. Ill). It should be possible then to approach the problem of what is income in respect of a decedent from a different direction by determining what property is not entitled to an adjusted basis under section 113. But neither the wording of this section, the regulations nor the cases provide any significant guidelines. Indeed, section 113 has been criticized as “one of the most clearly illogical of all income tax provisions.” Vickrey, Agenda for Progressive Taxation, 139 (1947).
We are left then only to work with section 126. Despite the vagueness of the term “income in respect of a decedent,” interpretive developments of the last 15 years have established some patterns on which we may reasonably rely and against which we may trace the parties’ contentions.
The plaintiff’s main contention is that the scope of the present income-in-respect-of-a-decedent-provision is restricted to income which under the 1934r-1942 law would have *298 been accrued to the decedent in her last return. That is to say, only income which would properly have been accruable to the decedent on the date of her death can be designated as income in respect of a decedent when it has subsequently been collected by the estate. In the instant case, the plaintiff continues, the rents, both cash and crops, were not fully ascertainable on the date of decedent’s death and were in fact in dispute until some time in 1954. Since they were not fully ascertainable they were not properly accruable to the decedent on the date of her death. Hence, as ultimately collected by the estate the rents are not income in respect of a decedent.
The defendant takes an equally steadfast position. It maintains that income in respect of a decedent is merely that money which would have been reported as income by the decedent if she had but lived to collect it herself. Undoubtedly, had the decedent collected the rents and sold the crops she would have been in receipt of income. Therefore, when her estate collected the rents after her death and sold the crops the monies received were income to the estate and taxable to the estate as income in respect of a decedent.
As fully correct statements of the law we can accept neither party’s general contention. We do not agree with the defendant that all money received by the estate is to be treated as it would have been if the decedent had lived and received it. That comprehends too much, and does not adequately distinguish between income earntd by the decedent and income earned entirely by the estate after decedent’s death. See Rev. Rul. 57-554, 57-2 Cum. Bull. 861; Rev. Rui. 60-227, 60-1 Cum. Bull. 262. Neither can we accept the plaintiff’s position that only items properly accruable to the decedent on the date of her death — in an accounting sense — are taxable to her estate as income in respect of a decedent. This comprehends too little and gives overriding significance to the indefinite term “accruable.”
Certainly the Congress has been concerned with removing discrimination between cash and accrual method taxpayers, and with avoiding the unfair bunching problems which arose under prior law when all sums due to a decedent were accrued to him on the date of his death. But the Congress has also *299 been concerned with retrieving lost revenue. Section 126 is intended to further the general purpose of the Internal Revenue Code that all income should pay a tax. We think it clear that the intent of the Congress in enacting this section continued to be, as stated by the Supreme Court in Enright, “to cover into income the assets of decedents, earned during their life and unreported as income.” 312 U.S. at 644. The income in respect of a decedent provision represents an attempt to implement these policies in a maimer which reduces the importance of death in the actual collection of the revenue. See Commissioner v. Linde, 213 F. 2d 1 at 5 (9th Cir. 1954).
The plaintiff’s asserted position has been rejected in a series of cases which has evolved mainly in the partnership area. Money paid to the widow or to the estate of a deceased partner has been held taxable as income in respect of a decedent even though it was perfectly clear that on the date of death the deceased partner had no ascertainable claim to the money and could not properly have accrued the amounts ultimately received by his estate. In Riegelman v. Commissioner, 253 F. 2d 315, 318-319 (2d Cir. 1958), the question was “whether the post-death partnership income received by Riegelman’s estate constitutes ‘income in respect of a decedent,’ * * The court stated: “The payments were not gifts, nor were they attributable to anything done by Riegel-man’s estate. They were the fruits of the man’s professional activity during his lifetime; * * The case of United States v. Ellis, 264 F. 2d 325 (2d Cir. 1959), was almost identical to Riegelman and the court again taxed receipts from a partnership to a deceased partner’s estate as income in respect of a decedent. Similarly, in O’Daniel's Estate v. Commissioner, 173 F. 2d 966 (2d Cir. 1949), the court held that a bonus payment to an officer of a small corporation designated and fixed some 4 months after his death came within section 126 and “clearly represented compensation for his services and any right to receive it that was realized by his estate was acquired through him and never arose in any other way or through any other source.” See also Bausch's Estate v. Commissioner, 186 F. 2d 313 (2d Cir. 1951).
*300 In Commissioner v. Linde, 213 F. 2d 1 (9th. Cir. 1954), the decedent, the owner of a vineyard, had delivered grapes to various cooperatives for conversion into wine and for the sale of the wine. The liquidation of the wine pools by the conversion of the grapes and the disposition of the wine did not occur until after the decedent’s death. Even though no sales of the grapes to the cooperatives had occurred the court held that the payments which the decedent’s estate received from the cooperatives after the decedent’s death were realized in consequence of contracts and deals made by the decedent in his lifetime. “No act or thing taken or performed by the taxpayer [the estate] operated to procure or to give rise to this payment. Such payments had their source exclusively in the decedent’s contract and arrangement with the cooperative associations.” 213 F. 2d at 4. The court concluded that these payments constituted income in respect of a decedent and were taxable as such.
The situation in the instant case is much the same as in the cases cited above. These are the important considerations: the rents received by the plaintiff are directly attributable to economic activities which occurred prior to decedent’s death; they would have been income to the decedent had she but lived to receive them; they were fully accruable to the decedent on the date of her death in the sense that she was fully entitled to receive them but orthodox accounting technique prevented their accrual solely because they were not ascertainable in amount; they were not attributable to any acts performed by the estate nor were they attributable to unrealized passive appreciation of property owned by the decedent at the date of her death. These diverse characteristics do not permit of easy generalization, and we cannot draw from them a rule as to what is income in respect of a decedent in all cases. It is fair to say, however, in light of the development of the statute, that each of these characteristics represents an element in the composite concept that is income in respect of a decedent.
The rent on the Eloy tract was payable in cash, albeit it was to be ascertained in amount as a percentage of the net proceeds received from the sale of crops grown on the tract. As a cash rent we find it indistinguishable from any other *301 kind of cash rent that might have arisen, as under a residential or commercial lease. On the basis of the foregoing discussion we find that this rent, collected by the estate, is income in respect of a decedent and taxable as such.
The rent on the Coolidge tract was by the terms of the lease not only to be ascertained from the amount of crops grown on the tract but it was also to be paid in crops. While the receipt of rent in property rather than in cash would not seem to affect the income character of the payments, crop-rents have frequently received special treatment under various provisions of the revenue acts and they must now be given further consideration.
Section 61 of the 1954 Code, 26' IT.S.C. (I.E.C. 1954) § 61, specifically includes rents in the definition of gross income. The regulations repeat this directive of the Code. However, the regulations also describe the computation of farm income as follows: “Crop shares (whether or not considered rent under state law) shall be included in gross income as of the year in which the crop shares are reduced to money or its equivalent.” This same rule is announced for farmers using the cash method and the accrual method of accounting. Treas. Eeg. § 1.61-4 (1957), derived from Treas. Eeg. 118, § 39.22(a)-7(c) (1953). It further appears that only an actual sale of the crops is a reduction to money or its equivalent as the regulations describe. Perry v. United States, 58-2 USTC ¶ 9587 (D.C. Miss. 1958); SoRelle v. Commissioner, 22 T.C. 459 (1954). See also Rev. Rul. 56-496, 56-2 Cum. Bull. 17. The lessor who has received crop-rent has of course received an asset of value, but as a matter of administrative convenience the recognition of this value as income is deferred until the crops are reduced to money. Crops received as rent exist in the hands of the lessor as a unique kind of property which can be described, like a right to receive future income, as a potential income asset. Cf. Citizens Federal Savings and Loan, Association of Cleveland v. United States, 154 Ct. Cl. 305, 290 F. 2d 932; Williamson, Transferee v. United States, ante, p. 279; 292 F. 2d 524.
Now if a landlord died while in possession of certain crops which he had received as rent we believe that under present law the essential income nature of these crops would follow *302 the crops into the landlord’s estate. The crops would remain crop-rents in the hands of the estate and would represent a form of income in respect of a decedent. Furthermore, under section 126 these crop-rents would be considered in the hands of the estate to have the same character which they had in the hands of the decedent — the potential of producing taxable income through sale. Only when the estate finally sold the crops would income be recognized. But at that point the money derived from the sale would be taxable, and taxable as income in respect of a decedent.
We are aware that this view of the law does not accord with Rev. Rul. 58-436, 58-2 Cum. Bull. 366. We believe that ruling is an improper extension of the holding of the court in Burnett v. Commissioner, supra, and is not a correct exposition of the law. The Burnett case, as we have mentioned, arose prior to the enactment of section 126, and concerned the propriety of accruing in the decedent’s last return the value of cattle which the decedent had raised and which he still owned at the time of his death. No rents were involved. The court held that the value of the unsold cattle should not be accrued to the decedent as income as of the date of his death. Considering the then existing law, we agree with the result reached by the court. But the case cannot be extended and given new meaning under the present law which is based on an amplified and entirely different concept of taxing the earnings of a decedent. See Commissioner v. Linde, supra, at 6 and 7.
In the instant case the decedent had not received the disputed crop-rents. The plaintiff can derive no benefit from this fact. The decedent’s estate comprised among other things a right to collect crop-rents that had been earned prior to decedent’s death. As rents these crops were income in respect of a decedent according to the first part of this opinion. As cróp-rents they first became recognized as income and taxable when they were sold for the account of the estate. At that point the income-producing potential of the crops had been fully achieved and was taxable. In this manner congressional purpose is fulfilled. The privilege of not recognizing the crop-rents as income until their sale is extended from the decedent to her estate, but what is *303 in reality earned income does not escape its intended proportionate burden of taxation.
Accordingly, the refund of income taxes here sought by the plaintiff is denied. The petition will be dismissed.
It is so ordered.
Duefee, Judge; Laeamoee, Judge; MaddeN, Judge, and Whitakeb, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, the Estate of Helen Davison, is properly represented in this action by its duly authorized and appointed executor, the First National Bank of Arizona.
2. The First National Bank of Arizona is a national banking association having its home office at 411 North Central Avenue, Phoenix, Arizona.
3. The decedent, Helen Davison, died on December 24, 1952.
4. Prior to her death, from December 31,1951, to her death on December 24,1952, Helen Davison was at all times a resident of Eloy, Arizona.
5. During the years prior to her death decedent reported her income on the cash basis.
6. Prior to her death the decedent was the sole owner of two parcels of real property. The first comprised 320 acres located in Coolidge, Arizona, while the second was 640 acres situated in Eloy, Arizona.
7. On December 4, 1951, the decedent leased the 320 acres located in Coolidge, Arizona, to an individual named Fred Jones. The lease was in writing and was to run from January 1, 1952 to January 1, 1953. The terms of the lease provided that the lessee, Fred Jones, was to pay to decedent, as rent, one fourth of all the crops grown on the subject parcel of land. The lessee was to pay all growing and harvesting costs excluding certain special assessments, if any, levied by the San Carlos Proj'ect.
8. In February of 1952 decedent leased the 640 acres located in Eloy, Arizona to Leland Jones and Mike Jones. *304 The said lease was in writing and was to run from February 1952, until January 1, 1953, subject to the lessees’ right to harvest crops then growing on the land. The terms of the lease provided that the lessees, Leland Jones and Mike Jones, were to pay to decedent, as rent, one half of the net proceeds of all crops grown on the 640 acres. The lessees were to pay for all production costs. The lessor was to bear the expense of placing the water pumping equipment in first class operating condition.
9. During 1952 the lessees, Leland Jones and Mike Jones, assigned the lease, referred to in finding 8, to an Arizona corporation named Jones Banch Enterprises, Inc.
10. Up to the date of her death on December 24, 1952, the decedent had received, pursuant to the terms of the Fred Jones’ lease, a total of $6,516.01. This amount represented the proceeds from the sale of the decedent’s one-fourth of 129 bales of cotton grown by the lessee.
11. Subsequent to decedent’s death on December 24, 1952, the Estate of Helen Davison received, pursuant to the terms of the Fred Jones’ lease, $4,234.76 on February 9, 1953, and $9,902.38 on February 26,1953. The total of these two payments made in February 1953 was $14,137.14.
12. It is this $14,137.14, referred to in finding 11, which was paid to the decedent’s estate, after her death on December 24,1952, that the Commissioner of Internal Bevenue has treated as income in respect of a decedent for the year 1953.
13. The $14,137.14, referred to in findings 11 and 12, was included in Schedule F of the Federal estate tax return of the Estate of Helen Davison as a part of the gross estate of Helen Davison.
14. The $6,516.01 payment, referred to in finding 10, and the two February 1953 payments totaling $14,137.14, referred to in findings 11 and 12, constitute the total of all payments received by the decedent and the Estate of Helen Davison, respectively, pursuant to the terms of the Fred Jones’ lease covering 320 acres of land in Coolidge, Arizona.
15. Prior to her death on December 24,1952, the decedent received no payments from Leland Jones, Mike Jones, or Jones Banch Enterprises, Inc. pursuant to the terms of the Leland Jones and Mike Jones’ lease covering 640 acres of land in Eloy, Arizona.
*305 16. On. April 2, 1953, an interim statement of settlement account dated March 25,1953, was submitted to the Executor of the Estate of Helen Davison by Jones Eanch Enterprises, Inc. This interim statement was objected to and rejected by the Estate of Helen Davison. Subsequently, on May 20, 1953, Jones Eanch Enterprises, Inc. submitted a second statement of settlement account to the Estate of Helen Davison. This second statement indicated an amount due on the rent for the 640 acres at Eloy which was larger than the amount set forth in the first interim statement. A check in the sum of $13,629.43 was delivered by Jones Eanch Enterprises, Inc. to the Executor of the Estate of Helen Davison. This second accounting or statement was also objected to by the Estate of Helen Davison and the check accompanying said statement for the sum of $13,629.43 was held but not cashed. On J anuary 27,1954, a settlement was finally reached between Jones Eanch Enterprises, Inc. and the Estate of Helen Davison, and it was agreed that the total amount of rent due, pursuant to the terms of the written lease covering the 640 acres at Eloy, was $14,429.43. Thus, on J anuary 27, 1954, the check for $13,629.43 was cashed by the Estate of Helen Davison, and on February 2,1954, J ones Eanch Enterprises, Inc. issued to the Estate of Helen Davison a second check for $800 which was cashed on February 4, 1954. The total of $800 and $13,629.43 represented the final agreed to sum of $14,429.43.
17. The sum of $14,429.43 referred to in finding 16, constituted the total of all payments received from J ones Eanch Enterprises, Inc. by the Estate of Helen Davison pursuant to the terms of the Leland J ones and Mike J ones’ lease of the 640 acres at Eloy. It is this $14,429.43, paid to decedent’s estate after decedent’s death, which the Commissioner of Internal Eevenue has treated as income in respect of a decedent for the year 1954.
18. The $14,429.43, referred to in findings 16 and 17, was included in Schedule F of the Federal estate tax return of the Estate of Helen Davison as a part of the gross estate of Helen Davison.
19. If the payments received by the plaintiff under the terms of and pursuant to the Fred J ones’ lease, and referred to in finding 11, do not constitute income in respect of a de *306 cedent for the taxable period January 1, 1953, to December 31,1953, then plaintiff had a net operating loss carry-forward to the taxable period January 1, 1954 to April 1, 1954, of $10,930.38.
20. The plaintiff’s Federal income tax returns for the year 1953 and for the period January 1 to April 1, 1954, were timely filed with the District Director of Internal Revenue at Phoenix, Arizona. The return for 1953 showed an income tax liability of $536.39 and said tax liability was timely paid to the District Director of Internal Revenue at Pboenix, Arizona. The return for the period January 1 to April 1, 1954, showed an income tax liability of $79.47 and said tax liability was timely paid to the District Director of Internal Revenue at Phoenix, Arizona.
21. On May 2, 1957, the Commissioner of Internal Revenue issued a notice of adjustment alleging an overassessment in income tax against the plaintiff in the amount of $46.84 for the taxable year 1953. The entire amount of the asserted overassessment was due to (a) the exclusion by the Commissioner from gross income of $13,875 in crop proceeds which should have been reported for taxable period, January 1,1954 to April 1,1954, rather than the taxable period January 1, 1953 to December 31, 1953, and (b) the inclusion by the Commissioner in gross income of the sum of $14,137.14, referred to in finding 11, as income in respect of a decedent under section 126, Internal Revenue Code of 1939.
22. The exclusion of the $13,875 in crop proceeds, referred to in finding 21, was and is correct, and such sum was income to plaintiff for the taxable period January 1,1954, to April 1, 1954.
23. On September 9,1957, plaintiff filed with the District Director of Internal Revenue at Phoenix, Arizona, a claim for the refund of $489.55 of income tax paid for the year 1953, or such greater amount as is legally refundable. The said claim for refund asserted that the said $14,137.14, referred to in paragraph 11 above, did not constitute income in respect of a decedent to plaintiff.
24. On May 2,1957, the Commissioner of Internal Revenue issued a statutory notice of deficiency to plaintiff asserting a deficiency in income tax of $11,892.11 for the taxable pe *307 riod January 1, 1954, to April 1, 1954. The said asserted deficiency was based upon the inclusion in the income of plaintiff of $14,429.43, referred to in finding 16, as income in respect of a decedent under Section 126, Internal Eevenue Code of 1939, and of $13,875 of crop proceeds, referred to in finding 21 above, which plaintiff had reported as income for the taxable year 1953.
25. On June 17, 1957, plaintiff paid the said asserted deficiency of $11,892.11, referred to in finding 24, plus $2,066.62 of interest thereon or a total of $13,958.73 to the District Director of Internal Eevenue at Phoenix, Arizona.
26. On September 9, 1957, plaintiff filed a claim for refund of income tax and interest collected thereon with the District Director of Internal Eevenue at Phoenix, Arizona, in the sum of $13,238.73 plus interest for the taxable period January 1,1954, to April 1,1954.
27. On May 7,1958, the District Director of Internal Eeve-nue, Phoenix, Arizona, formally disallowed by registered mail the plaintiff’s claims for refund for the years 1953 and 1954.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.