GEORGE W. AND MARY ANN KECK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MARY ANN KECK, TRANSFEREE OF THE ESTATE OF ARTHUR D. SHAW, DECEASED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5326–65, 5327–65. Filed January 2, 1968.

*Duane L. Isham* and *Richard E. Guster,* for the petitioners.
*Larry L. Nameroff,* for the respondent.

OPINION

MULRONEY, *Judge:* Respondent determined a deficiency in the income tax of George W. and Mary Ann Keck in docket No. 5326–65 in

the amount of $65,919.76 for the year 1960. Respondent also asserted transferee liability in docket No. 5327–65 against Mary Ann Keck in the amount of $139,401.05, plus interest, as transferee of the assets of the Estate of Arthur D. Shaw. The issue in these consolidated cases is whether certain amounts received in 1960 by Mary Ann Keck and by the estate were taxable as income in respect of a decedent under the provisions of section 691 of the 1954 Code.[1]

All of the facts have been stipulated and they are so found.

George W. and Mary Ann Keck, husband and wife, were residents of Akron, Ohio, at the time the petitions herein were filed. They filed a joint Federal income tax return for 1960 with the district director of internal revenue at Cleveland, Ohio. Mary Ann Keck was formerly Mary Ann Shaw, the surviving spouse of Arthur D. Shaw of Akron, Ohio, who died on November 27, 1958. The First National Bank of Akron was appointed executor of the Estate of Arthur D. Shaw and filed a 1960 fiduciary income tax return for said estate with the district director of internal revenue at Cleveland, Ohio.

Motor Cargo, Inc., was organized in 1931 with its principal place of business in Akron, Ohio. The corporation was engaged as a common carrier in interstate commerce. Approximately 75 percent of the capital stock of Motor Cargo, Inc., was owned by Owen O. Orr and members of his family, while the balance of approximately 25 percent was owned mainly by other employees of the corporation, including Arthur D. Shaw.

Industrial Oil and Terminal Co. was organized in 1945 with its principal office in Akron, Ohio. The corporation owned trucking terminal properties in Union, N.J., and Baltimore, Md., which it leased to Motor Cargo, Inc. The Owen O. Orr family owned 76 percent of the stock of the corporation and 24 percent was owned by other persons, for the most part employees of Motor Cargo, Inc.

Mocago Equipment Corp., which was organized in 1954, owned tractor equipment which it leased to Motor Cargo, Inc. The Owen O. Orr family owned 26 percent of the stock of the Mocago Equipment Corp. and 74 percent of the stock was owned by other persons, mainly employees of Motor Cargo, Inc.

On March 1, 1956, Arthur D. Shaw owned the following shares of stock in the three corporations:

| Corporation | Number of shares owned | Percentage of stock owned | Cost basis |
|---|---|---|---|
| Motor Cargo, Inc | 266 | 9.97 | $14,546 |
| Mocago Equipment Corp | 100 | 6.60 | 10,000 |
| Industrial Oil & Terminal Co | 90 | 18.00 | 10,225 |

---

[1] All section references will be to the 1954 Code, as amended, unless otherwise noted.

As of March 1, 1956, Motor Cargo, Inc., Industrial Oil and Terminal Co., and the Mocago Equipment Corp. entered into an "Executory Agreement for Sale of Assets" under which they agreed to sell their assets to Consolidated Freightways, Inc., provided that the requisite approval by the Interstate Commerce Commission could be obtained. In general, the executory agreement also outlined the purchase price to be paid by Consolidated Freightways, Inc., for the various properties; imposed certain obligations upon the sellers in conducting their operations until the sale was finally consummated; provided that all the outstanding stock of the selling corporations be placed in escrow with the First National Bank of Akron; provided that Consolidated Freightways, Inc., should deposit in escrow (with the same escrow agent as above) $500,000 in cash or, at its option, either negotiable debt securities having an equivalent market value or preferred stock of Freightways Terminal Corp. having an aggregate par value of $500,000; described the respective rights of the parties, in the event of breach of contract, with respect to the assets deposited in escrow by the parties; and provided that the selling corporations could elect to rescind the executory agreement if they were unable to obtain a ruling from the Internal Revenue Service that the gain realized by them from the transfer of assets would be exempt from Federal income tax under section 337.

On April 6, 1956, special meetings of the stockholders of Motor Cargo, Inc., Industrial Oil and Terminal Co., and the Mocago Equipment Corp. were held to consider and act upon the offer made by Consolidated Freightways, Inc., to purchase all of the shares of stock or assets of the three corporations. At each of these shareholders meetings the following resolution was adopted:

RESOLVED, that the sale of the assets of this corporation and/or sale of its capital shares of stock as contained in one certain contract of sale more fully identified as being a contract dated March 1, 1956, between Motor Cargo, Inc., Industrial Oil and Terminal Co., Orr Service & Supply Co., Triple "O" Service & Supply Co., each an Ohio corporation, Mocago Equipment Corporation, a Delaware corporation, jointly and severally FIRST PARTIES; Owen O. Orr, SECOND PARTY, and Consolidated Freightways, Inc., a Washington corporation, THIRD PARTY, be, and the same is hereby approved.

At a special meeting of the board of directors of Motor Cargo, Inc., held on May 2, 1956, the following resolution was adopted:

RESOLVED that this Board approves, ratifies and affirms the EXECUTORY AGREEMENT FOR SALE OF ASSETS made as of March 1, 1956, between Motor Cargo, Inc., Industrial Oil and Terminal Company, Mocago Equipment Corporation, and CONSOLIDATED FREIGHTWAYS, INC., whereby, among other things provided for therein, this corporation pursuant to the conditions thereof proposes to sell and transfer to Consolidated Freightways, Inc., all of its property, both real and personal, as well as that of its two wholly owned

subsidiaries, Motor Cargo of Minnesota, Inc., and Motor Cargo of Delaware, Inc., for a total cash consideration of $8,655,000.00.

BE IT FURTHER RESOLVED that Owen O. Orr, President, A. D. Shaw, Executive Vice-President, or M. R. Kalb, Secretary, of this corporation be authorized to sign, verify and file with the Interstate Commerce Commission or any other regulatory body having jurisdiction in this matter, an application for authority to consummate the transaction and to sign, verify and file any and all other papers and documents necessary or required by the Interstate Commerce Commission or other regulatory bodies having jurisdiction over the proposed transaction.

On April 6, 1956, Arthur D. Shaw delivered the certificates representing his 266 shares of stock of Motor Cargo, Inc., 90 shares of stock of Industrial Oil and Terminal Co., and 100 shares of stock of Mocago Equipment Corp. to the First National Bank of Akron as escrow agent under the aforesaid executory agreement with Consolidated Freightways, Inc. The assignment form on the stock certificates so delivered was not executed by Arthur D. Shaw but he delivered executed blank stock powers to the escrow agent at the same time. All dividends declared and paid with respect to these shares after April 6, 1956, were paid to Arthur D. Shaw until his death and thereafter to his estate and Mary Ann Keck. The record owner continued to exercise all voting rights with respect to the shares of stock.

On or about April 6, 1956, Consolidated Freightways, Inc., deposited with the escrow agent preferred stock of Freightways Terminal Corp., a subsidiary of Consolidated Freightways, Inc., having an aggregate par value of $500,000.

On May 3, 1956, the attorney for the sellers requested a tax ruling relative to the application of section 337 to the proposed sale of property to Consolidated Freightways, Inc. By letter dated June 15, 1956, the Internal Revenue Service ruled that section 337 would be applicable.

On May 25, 1956, application was made to the Interstate Commerce Commission for approval of the proposed sale. Final approval of the sale by the Interstate Commerce Commission was made on May 5, 1960.

Arthur D. Shaw died on November 27, 1958. On February 8, 1960, the First National Bank of Akron, as executor of the Estate of Arthur D. Shaw, in order to obtain funds for payment of the Federal estate tax due, obtained 100 shares of stock of Motor Cargo, Inc., from the First National Bank of Akron as escrow agent. The bank sold 48 of these shares of stock to Mary Ann Keck for $150,877.68 and distributed the remaining 52 shares to her as residuary beneficiary under the will of Arthur D. Shaw. Mary Ann Keck borrowed $150,000 from the First National Bank of Akron, pledging the 100 shares of Motor Cargo, Inc., stock as security, and used this amount (plus $877.68) to pay for the 48 shares of stock purchased by her.

On May 23, 1960, after the approval and authorization by the Interstate Commerce Commission had been obtained on May 5, 1960, the First National Bank of Akron, as executor of the Estate of Arthur D. Shaw, executed and delivered proxies to Owen O. Orr authorizing him to vote the estate's 166 shares of stock in Motor Cargo, Inc., 90 shares of Industrial Oil and Terminal Co., and 100 shares of Mocago Equipment Corp. in favor of carrying out the provisions of the March 1, 1956, contract and, in addition, to wind up and dissolve the three corporations. On the same date, Mary Ann Keck executed and delivered proxies to Owen O. Orr authorizing him to vote her 100 shares of stock in Motor Cargo, Inc., in favor of carrying out the provisions of the March 1, 1956, contract. At the stockholders meetings held on May 31, 1960, by Motor Cargo, Inc., and Industrial Oil and Terminal Co., and on June 8, 1960, by Mocago Equipment Corp., the stockholders of the respective corporations authorized and directed the transfer of all assets and liabilities of the corporations to Consolidated Freightways, Inc., in accordance with the March 1, 1956, agreement. In addition, the stockholders of the respective corporations adopted resolutions to liquidate the corporations.

The actual transfer of assets by Motor Cargo, Inc., Industrial Oil and Terminal Corp., and Mocago Equipment Corp. to Consolidated Freightways, Inc., was made on July 18, 1960. The three corporations were liquidated on July 21, 1960, and each of the corporations distributed the cash received by it from Consolidated Freightways, Inc., to its stockholders in exchange for and in cancellation of its outstanding stock. The First National Bank of Akron, as executor of the Estate of Arthur D. Shaw, received the following amounts from the liquidating corporations:

Motor Cargo, Inc.—166 shares at $3,143.2858 per share_ $521, 785. 45
Industrial Oil and Terminal Co.—90 shares at $390
  per share_____ 35, 000. 00
Mocago Equipment Corp.—100 shares at $300 per share_ 30, 000. 00

On the same date (July 21, 1960) Mary Ann Keck received $314,328.58 in exchange for and in cancellation of the 100 shares of Motor Cargo, Inc., stock held by her.

In the joint Federal income tax return for 1960 filed by Mary Ann Keck and George W. Keck they showed in Schedule D (Gains and Losses from Sales or Exchanges of Property) the receipt of $314,328.58 in exchange for the 100 shares of Motor Cargo, Inc., stock, but they also stated that the basis of such stock was $314,328.58, thus reporting no gain or loss realized from the transaction. In the fiduciary income tax return filed for 1960 by the First National Bank of Akron, as executor of the Estate of Arthur D. Shaw, there was reported no gain or

loss realized in connection with the proceeds received from the liquidating corporations.

On or before December 4, 1961, the First National Bank of Akron, as executor of the Estate of Arthur D. Shaw, transferred to Mary Ann Keck as distributions of said estate, in accordance with the will of Arthur D. Shaw, property having a value in excess of $250,000. Upon such transfer and at all times subsequent thereto the estate has been without any assets. On January 27, 1964, Mary Ann Keck executed I.R.S. Form 2045 providing as follows:

In consideration of the Commissioner of Internal Revenue not issuing a statutory notice of deficiency to and making an assessment against the above-named transferor fiduciary [First National Bank of Akron, executor of said estate], the undersigned admits that she is the transferee of assets received from said transferor fiduciary, and assumes and agrees to pay the amount of any and all Federal income * * * taxes finally determined or adjudged as due and payable by the above-named transferor fiduciary for the taxable year * * * ended December 31, 1960, to the extent of her liability at law or in equity, as a transferee within the meaning of Section 6901 of the Internal Revenue Code of 1954 * * *

In docket No. 5327–65 respondent determined that Mary Ann Keck was liable as transferee of the assets of the Estate of Arthur D. Shaw for a deficiency in income tax due from the estate for the year 1960 in the amount of $139,401.05, plus interest. Respondent determined that, under the provisions of section 691 and section 1014 (c), the estate realized long-term capital gains on the exchange of stock with the liquidating corporations, as follows:

| Stock | Basis | Proceeds | Long-term gains |
|---|---|---|---|
| 166 shares of Motor Cargo, Inc. | $9,077 | $521,785.45 | $512,708.45 |
| 100 shares of Mocago Equipment Corp. | 10,000 | 30,000.00 | 20,000.00 |
| 90 shares of Industrial Oil & Terminal Co. | 10,225 | [1] 35,100.00 | 24,875.00 |
| Totals | 29,302 | 586,885.45 | 557,583.45 |

[1] There is an unexplained difference of $100 between this total and that appearing in the stipulation of facts.

In docket No. 5326–65 respondent determined under sections 691 and 1014(c) that petitioners George W. and Mary Ann Keck realized a long-term capital gain in connection with the proceeds received in connection with their 100 shares of stock in Motor Cargo, Inc., computed as follows:

Proceeds received in exchange for 100 shares of Motor Cargo, Inc. ............................................. $314,328.58
Less: Basis ............................................. 5,469.00

Long-term capital gain realized ..................... 308,859.58

Respondent now concedes on brief that "with respect to the 48 shares of Motor Cargo purchased from the estate by * * * Mary Ann Keck, the proceeds received by (her) from the estate did not constitute income in respect of a decedent."

Section 691 provides that the—

amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period * * * shall be included in the gross income, for the taxable year when received, of:

(A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;

(B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or

(C) the person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the amount is received after a distribution by the decedent's estate of such right.

Section 1014(a) provides that the basis of property in the hands of a person acquiring the property from a decedent shall be the fair market value of the property at the date of the decedent's death. However, section 1014(c) provides that the above statutory provision "shall not apply to property which constitutes a right to receive an item of income in respect of a decedent under section 691."

Prior to 1934, under judicial interpretation of existing revenue statutes, income which had accrued to a cash basis taxpayer at the time of his death was not taxable to him and such accrued income could subsequently be collected by his estate without the payment of any income tax. Section 42 of the Revenue Act of 1934 was amended to prevent this revenue loss by providing that in the case of the death of a taxpayer there would be included in his last return all amounts accrued up to the date of his death even though such amounts were not yet received and without regard to the taxpayer's method of accounting. However, this statutory device at times resulted in pyramiding into a decedent's final tax return substantial amounts of income which, except for death, would have been spread over a number of years. See *Helvering* v. *Enright*, 312 U.S. 636 (1941).

To eliminate this undesirable pyramiding effect, Congress in 1942 enacted section 126 of the 1939 Internal Revenue Code (the predecessor of section 691 of the 1954 Internal Revenue Code) with its concept of taxing income in respect of a decedent to the recipient of the income. In *Commissioner* v. *Linde*, 213 F. 2d 1 (C.A. 9, 1954), the court stated with reference to section 126 of the 1939 Internal Revenue Code that, while it was specifically designed to eliminate "bunching" of income in a decedent's last return, the Code section also represented "an im-

proved method adopted by Congress in aid of its continuing effort to avoid the loss of tax upon income merely because of the death of the decedent who would have paid a tax upon the same economic returns had he lived to receive them."

We agree with respondent that the amounts received in 1960 from the liquidating corporations by Mary Ann Keck and by the First National Bank of Akron, as executor of the Estate of Arthur D. Shaw, are taxable as income in respect of a decedent. These proceeds had their source in the binding contract of March 1956 to sell the assets of the three corporations to Consolidated Freightways, Inc. The execution of the sale merely awaited final approval by the Interstate Commerce Commission before it could be carried out. Decedent's stock in the selling corporations, together with all other outstanding stock in such corporations, was deposited in escrow under the terms of the executory contract and in the event of breach of contract by the selling corporations the buyer had the right to demand delivery of the escrowed stock in lieu of transfer of the corporate assets. The consideration to be paid for the assets was set forth in the contract and it established the values of the corporate shares until the final liquidation of the selling corporations in 1960. For example, the liquidating distribution to shareholders made with respect to the stock in Motor Cargo, Inc., was based on $3,143.2858 per share, which was the price per share of the total consideration stated in the executory contract allocated to the purchase by Consolidated Freightways, Inc., of the assets of Motor Cargo, Inc. This was also the same valuation used for estate tax purposes for the Motor Cargo, Inc., stock owned by Arthur D. Shaw when he died in 1958.

It is readily apparent that the liquidation of the three selling corporations in 1960 after the sale of the assets was carried out was an integral part of the original plan to sell such corporate assets. The March 1956 executory contract explicitly provided that if the selling corporations were unable to get a favorable ruling from the Internal Revenue Service as to the applicability of section 337 to the sale of assets they could elect to rescind the executory contract. In June 1956 the Commissioner of Internal Revenue Service ruled that section 337 would be applicable to the proposed sale of property. Immediately after the sale was consummated and the actual transfer of assets to the buyer was made on July 18, 1960, the three selling corporations were liquidated (July 21, 1960), and the cash payments received by such corporations from the buyer were distributed to their respective stockholders in exchange for the outstanding stock.

Thus it is apparent that all the significant economic activity in connection with the sale of the corporate assets had been accomplished prior to decedent's death in November 1958, and under these circum-

stances it is immaterial that the actual consummation of the sale did not occur until after decedent's death. *Commissioner* v. *Linde, supra; Davison's Estate* v. *United States*, 292 F. 2d 937 (Ct. Cl. 1961).

Petitioners' argument is that the payments received by the estate and by Mary Ann Keck in 1960 were generated by the economic activity of the decedent's estate or others after decedent's death, not by the economic activities of the decedent, and that consequently such payments do not fall within the ambit of section 691. Petitioners emphasize the following activities occurring after decedent's death: (1) The proceedings before the Interstate Commerce Commission in order to obtain the necessary approval for the sale; and (2) the action taken by the stockholders to liquidate the corporations in 1960 after the sale was consummated. There are indications in the record that it was the *buyer's* application seeking approval for the purchase of the assets that was before the Commission and it further appears that this application, which had been filed more than 2 years before decedent's death, was being considered in conjunction with the acquisition by the buyer of four other eastern motor carriers. Under the executory contract of 1956 the sellers were under an obligation to offer all necessary assistance in obtaining the necessary Commission approval and they further agreed to prepare whatever material that the buyer's counsel deemed necessary for the due prosecution of the application before the Commission. We do not believe that the activities of third parties in these proceedings which were initiated as a result of the 1956 contract of sale and were well under way at the date of decedent's death can be regarded as economic activities of petitioners so as to prevent the application of section 691 to the payments received by them. Nor is there any merit in the argument that the votes taken by the stockholders to liquidate the selling corporations were anything more than formal acts which were always contemplated by them as an integral part of the original plan to sell the corporate assets and then to liquidate the corporations under section 337 in order to avoid the impact of a double tax on the sales proceeds. These routine steps to liquidate the corporations, as well as the proceedings before the Commission, were the outgrowth of the 1956 contract of sale and other arrangements entered into by decedent prior to his death.

In *Commissioner* v. *Linde, supra*, the decedent, who owned and operated a vineyard, had delivered grapes to various cooperatives which commingled all the members' grapes and processed them into wine which the cooperatives then sold and remitted the net proceeds to the members. After decedent's death, his surviving spouse received payments from the cooperatives for the grapes delivered by decedent before his death. The payments represented net proceeds of sales made by the cooperatives after the date of decedent's death. The Court of

Appeals, after noting that it was not necessary to establish a sale by decedent during his lifetime, held that the payments in issue were taxable as income in respect of a decedent, stating in part as follows:

The payments which the taxpayer received in 1945 were realized under and in consequence of contracts and deals made by the decedent in his lifetime. No act or thing taken or performed by the taxpayer operated to procure or to give rise to this payment. Such payments had their source exclusively in the decedent's contract and arrangement with the cooperative associations. * * *

In *Trust Co. of Georgia* v. *Ross*, 262 F. Supp. 900 (N.D. Ga., 1966), on appeal (C.A. 5, Dec. 30, 1966), the factual situation was strikingly similar to the one before us here. Decedent and others has executed a written agreement during the decedent's lifetime to sell the stock or assets of certain corporations. Under the agreement, the sellers placed their stock in escrow. Also, pursuant to the agreement, a ruling was obtained from the Internal Revenue Service that section 337 of the 1954 Internal Revenue Code would apply to the sale of the assets of the corporations. Subsequent to decedent's death the agreement was amended, the sale of the corporate stock was consummated, and the purchase price for the decedent's stock was paid to his estate. The court held that the amount thus received by the estate was taxable as income in respect of a decedent under section 691, citing *Commissioner* v. *Linde, supra*, and *Davison's Estate* v. *United States, supra*, among other cases. The court noted that it was decedent's economic activity leading up to the written agreement that produced the income in question and not any acts of consequence performed by the estate. The court also noted that it was immaterial that the sale of the stock had not yet occurred at the date of decedent's death since such stock had been placed in escrow and thus beyond his control. Nor did it matter that certain conditions precedent necessary to the stock sale still remained unfulfilled at the date of decedent's death. The fact that in the *Trust Co. of Georgia* case the contract of sale was for stock and the decedent signed the contract and here the contract of sale was for corporate assets and the corporations alone executed the contract is not a distinction that should support a different result here. In both cases the purchaser sought the acquisition of corporate assets. This could be accomplished without tax consequences at the corporate level by acquiring the stock and liquidating the corporation or acquiring the assets and leaving the liquidating to the original stockholders. The fact that different paths were chosen by the parties is without significance. In both instances the income was realized as a consequence of the contract and had decedent lived and received these amounts he would have received the income held taxable here. That is enough to make such amounts income in respect of a decedent. It is immaterial that decedent was not personally a party to the contract. He was a

party to the deal or transaction as witnessed by the corporate minutes and his delivery of his stock to the escrow agent.

We find nothing in respondent's regulations which supports petitioners or in any way departs from the principles expressed in the above-cited cases. We find, and so hold, that the proceeds received by petitioners in 1960 in exchange for their stock following the sale of the corporate assets are taxable to the recipients as income in respect of a decedent within the meaning of section 691.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

FEATHERTON, *J.* With due deference I dissent.

In general, the term "income in respect of a decedent" applies only to "those amounts to which a decedent was entitled as gross income" but which were not properly includable in his final return. Sec. 1.691(a)-1(b), Income Tax Regs. The proper test for determining whether gain from the sale of property is to be treated as income in respect of a decedent is the status of the transaction at decedent's death, not who carried on the "economic activity" which brought it to that status. Thus, as example (4) of the Regulations explains, where, pursuant to a contract made by A obligating his executor to sell his stock, a sale is made, "there is no income in respect of a decedent with respect to the appreciation in value of A's stock to the date of his death" because "the sale of stock is consummated after A's death." However, if A had in fact sold his stock prior to his death, but payment was not received until after his death, any gain from the sale would be section 691 income. Sec. 1.691(a)-2(b), example (4).

I do not think the present transaction had reached the point at decedent's death where it properly can be said that decedent's stock had been converted to "property which constitutes * * * an item of income in respect of a decedent under section 691." Sec. 1014(c), I.R.C. 1954. (1) The asset sale by the corporations was subject to approval by the Interstate Commerce Commission, a condition precedent not met until 18 months after decedent's death. Such approval is neither routine nor perfunctory. *Falwell* v. *United States*, 69 F. Supp. 71, 79 (W.D. Va. 1946), affirmed per curiam 330 U.S. 807 (1947). (2) At the time of his death, neither the decedent nor the other stockholders were contractually committed to the plan to liquidate the corporations. Owen O. Orr, the majority stockholder, for reasons of his own, might have decided not to liquidate the corporations.[1] Indeed, decedent's own stock

---

[1] We need not now decide what the result would be if decedent had been the controlling shareholder in the corporations.

wa$ not committed to vote for the plan until May 23, 1960, when the proxies were signed and delivered.

*Trust Co. of Georgia* v. *Ross*, 262 F. Supp. 900 (N.D. Ga. 1966), on appeal to the Fifth 'Circuit, is strongly relied upon by the majority opinion. That case involves a contract by the decedent to sell his stock, not a contract by the corporation to sell its assets with an informal understanding that the corporations would later be liquidated. The fact that both situations involve nonrecognition of gain at the corporate level (applying section 337 in the latter) is not sufficient to equate a sale by a corporation of its assets with a sale by a stockholder of his stock. Cf. *Boyle* v. *United States*, 355 F. 2d 233, 235 (C.A. 3, 1965) ; Rev. Rul. 64–308, 1964–2 C.B. 176.

I believe the majority opinion sanctions an income tax on the long-term appreciation in value of decedent's stock contrary to the intent expressed in Code sections 1014(a) and 2031 that unrealized gain included in computing the estate tax should not be subjected to another tax when such gain is subsequently realized by the estate or a legatee. Cf. *Levin* v. *United States*, 373 F. 2d 434 (C.A. 1, 1967), reversing 254 F. Supp. 640 (D. Mass. 1966).

Drennen, Withey, Forrester, Fay, and Tannenwald, *JJ.*, agree with this dissent.