**TRUST COMPANY OF GEORGIA**, Executor under the Will of Carling Dinkler, Sr., Plaintiff,

v.

**Aubrey C. ROSS**, District Director of Internal Revenue, Defendant.

**Carling L. DINKLER, Jr.** and Cornelia V. Dinkler, Plaintiffs,

v.

**Aubrey C. ROSS**, District Director of Internal Revenue, Defendant.

**TRUST COMPANY OF GEORGIA**, Executor under the Will of C. L. Dinkler, Sr. and Mrs. Joel W. Dinkler, surviving wife, Plaintiffs,

v.

**Aubrey C. ROSS**, District Director of Internal Revenue, Defendant.

Civ. A. Nos. 9609–9611.

United States District Court
N. D. Georgia,
Atlanta Division.

Dec. 12, 1966.

Alston, Miller & Gaines, Atlanta, Ga., Spain, Gillon & Young, Birmingham, Ala., for plaintiffs.

Charles L. Goodson, U. S. Atty., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., for defendant.

MORGAN, Chief Judge.

In these actions, which have been consolidated for trial, the plaintiffs seek the recovery of income taxes and interest paid for the year 1961 in the total amount of $1,007,376.09. Jurisdiction of the Court is invoked under Title 28 U.S. C., § 1346(a) (1).

All of the basic facts were stipulated by the parties.

The actions were tried before this Court without a jury. After hearing the testimony, examining the exhibits, briefs and pleadings of the parties, the case is now properly before the Court for determination.

The Dinkler Hotel chain was founded in the early 1920's by Carling Dinkler, Sr., and his father, and in 1960 consisted of the Dinkler-Tutwiler Corporation, Dinkler-Forsyth Corporation, Hotel Tutwiler Operating Company, Inc., Andrew Jackson Hotel Operating Company, Hotel Dinkler Plaza Operating Company, Belvedere Corporation and Dinkler Hotels Company, Inc. Carling Dinkler, Sr., individually, owned all of the stock of Dinkler-Tutwiler Corporation and, together with his wife and son, owned approximately 83 percent of the stock of Dinkler Hotels Company, Inc. (the rest of which stock was publicly held). Carling Dinkler, Sr., as trustee, owned all of the stock of Dinkler-Forsyth Corporation. Dinkler Hotels Company, Inc., owned the stock of Hotel Tutwiler Operating Company, Inc., Hotel Dinkler Plaza Operating Company, and Andrew Jackson Hotel Operating Company. The stock of Belvedere Corporation was owned by Hotel Dinkler Plaza Operating Company. Dinkler Hotels were operated in Atlanta, Georgia, Birmingham and Montgomery, Alabama, and Nashville, Tennessee.

In the spring of 1960, a broker, on behalf of Robert K. Lifton and his associates, made inquiries of Carling Dinkler, Jr., relative to the possible purchase of either the stock or assets of the companies which made up the Dinkler Hotel chain.

A conference was scheduled for and held on or about July 20, 1960, wherein Carling Dinkler, Jr., Carling Dinkler, Sr., Frank E. Spain of Birmingham, Alabama, Vice-President and General Counsel of Dinkler Hotels Company, Inc., and others represented the Dinklers, and Robert K. Lifton, Ira J. Hechler and Howard Weingrow represented the prospective buyers. This conference resulted in a verbal understanding to sell and to buy by the respective parties with a written agreement to follow.

On August 4, 1960, a written agreement was executed by Carling Dinkler, Sr., individually, Carling Dinkler, Sr., as Trustee for Carling Dinkler, Jr., Carling Dinkler, Jr., individually, and Dinkler Hotels Company, Inc. ("Dinklers"), with Associated Hotels Corporation, a newly formed corporation of which Robert K. Lifton, Ira J. Hechler and Howard Weingrow were the principal stockholders ("Associated"). By this agreement, the Dinklers agreed to sell and the buyers agreed to buy either the stock or assets of all the corporations making up the Dinkler Hotel chain.[1]

Contemporaneously with the signing of the aforesaid agreement, a management contract was entered into between Associated and Carling Dinkler, Sr., and Carling Dinkler, Jr., dated August 4, 1960.

The total purchase price for all of the assets and properties was stated in Paragraph 2 of said agreement as $10,946,363.00, subject to certain adjustments based upon an audit of June 30, 1960, Balance Sheets by Harris, Kerr, Forster & Company, and was to be paid in cash and by delivery of demand promissory notes,

---

1. Under the contract, Associated was to purchase the stock of Dinkler-Tutwiler Corporation and Dinkler-Forsyth Corporation, as well as the assets of Dinkler Hotels Company, Inc. These actions only involve the payment made for the stock of Dinkler-Tutwiler Corporation, individually owned by Carling Dinkler, Sr.

it being contemplated that the corporations involved would be forthwith liquidated so that the funds with which to pay the demand notes would be available from cash on hand in said corporations. The price at which the Dinkler-Tutwiler Corporation stock was to be sold, all of which stock was owned by Carling Dinkler, Sr., was specified in said agreement to be $3,381,933.30. Said price as stated was subject to certain adjustments provided for in said agreement, and after making such adjustments, the amount finally received by the Estate of Carling Dinkler, Sr., on February 23, 1961, for such stock was $3,539,948.00.

As provided for in Section 2 of the agreement, Associated deposited $300,-000.00 and executed copies of the agreement with Frank E. Spain, as Escrow Agent, contemporaneously with the execution of said agreement. By letter dated August 31, 1960, to Frank E. Spain from Associated, the provisions of the escrow agreement were waived and the $300,000.00 was delivered to the Dinklers, and the executed copies of the agreement of August 4, 1960, were delivered to the respective parties to such agreement.

Under Section 3 of the agreement of August 4, 1960, all of the stock subject to the agreement, including the stock certificates evidencing the Dinkler-Tutwiler Corporation stock, were placed in escrow with Frank Spain, registered in the name of Carling Dinkler, Sr., with separate assignments executed by the registered holder in blank. This stock remained in the possession of Escrow Agent Mr. Spain until delivered to Associated on February 23, 1961. Section 3 of the said agreement provided in part:

"In the event * * * that the Buyer shall default in the performance of any of its obligations under this Agreement, then the Escrow Agent shall redeliver the stock certificates and stock powers to the respective Sellers from whom they were received, and the Sellers shall retain all payments of the purchase price theretofore made as liquidated damages."

Section 17 of the August 4, 1960, agreement provided:

"*Total Loss of Dinkler Plaza Hotel:* In the event that prior to the closing there is a total loss of the Dinkler Plaza Hotel by casualty (including fire), whether or not compensable by insurance, or condemnation, then any party on notice to the other parties may elect to cancel this Agreement within ten days of such loss in which event all obligations or the parties (except with respect to the return of amounts paid by the Buyer) shall cease and terminate."

The audit report of Harris, Kerr, Forster & Company called for by Section 2 of the August 4, 1960, agreement was received on or about November 25, 1960.

The ruling from the Treasury Department of the United States called for by Section 15 of the August 4, 1960, agreement was issued on December 2, 1960. This ruling held that Section 337 of the Internal Revenue Code of 1954 would apply to the sale of the assets of Dinkler Hotels Company, Inc., and no gain or loss would be recognized in the hands of said company if a plan of complete liquidation were adopted on the same date as the sale of such assets under the August 4, 1960, agreement.

Under the August 4, 1960, agreement, the closing was to be completed on January 3, 1961. On December 16, 1960, Mr. Spain wrote to E. M. Turlington, Sr., Vice-President of Dinkler Hotels Company, Inc., who was assisting Mr. Spain in readying all matters to complete the sale, as follows: "So for the moment I believe we have done everything needful to be done before Jan. 3". By December 16th, the legal representatives of the Dinklers and Associated were preparing the closing agenda.

By letter dated December 20, 1960, from Associated to Dinkler Hotels Company, Inc., Messrs. Carling Dinkler, Sr., and Carling Dinkler, Jr., accompanied by checks in the aggregate amount of $200,-000.00, post-dated to January 3, 1961, the right of Associated to close under the August 4, 1960, agreement was ex-

tended to March 1, 1961. This postponement was provided for in the August 4th contract. Associated Hotels Corporation continued the closing date in order that Transcontinental Investing Company could obtain the permission of the Securities and Exchange Commission to make a public exchange offer, whereby Transcontinental would acquire the Dinkler properties to be acquired by Associated Hotels along with other similar properties. The initial prospectus of Transcontinental with regard to this matter was filed with the Securities and Exchange Commission in October, 1960. The Securities and Exchange Commission had not granted its approval to Transcontinental Investing Corporation by December 16, 1960, and it was unlikely that the approval would be obtained by the original closing date of January 3, 1961. The Securities and Exchange Commission granted its approval on this matter on January 27, 1961.

Carling Dinkler, Sr., died on January 30, 1961. His will was probated in the Court of Ordinary of DeKalb County, Georgia, on February 6, 1961, and the Trust Company of Georgia duly qualified as executor of the will.

Prior to January 30, 1961, Associated Hotels Corporation had indicated to Carling Dinkler, Sr., that it did not wish to purchase any interest in the Jefferson Davis Corporation, whose stock was owned by the Dinkler-Tutwiler Corporation and others. Prior to his death, Carling Dinkler, Sr., representing the Dinklers, agreed with Associated Hotels that the Dinkler-Tutwiler Corporation would sell its stock in the Jefferson Davis Corporation, thus eliminating that stock from the August 4 contract. Subsequently, by amendment dated February 23, 1961, signed by the Estate of Carling Dinkler, Sr., and Associated, the foregoing agreement which had been reached before the death of Carling Dinkler, Sr., was memorialized.

On February 6, 1961, Mr. Spain wrote C. H. Hyams, III, a director of Dinkler Hotels Operating Company, Inc., wherein he stated as follows:

"Fortunately all of our plans for the closing of the sale with Associated Hotels Corporation had been developed to the point where Carling's death will not effect [sic] the result. While in Atlanta I cleared with the New York attorneys on the further procedures. The recessed stockholders meeting of January 3 was to have been held on the day of the funeral. No one from outside came and the meeting was further recessed until February 22nd. You have received notice."

On or about February 1, 1961, officers of Associated advised Mr. Spain, counsel for the Dinklers, that Associated lacked $2,350,000.00 of having sufficient funds to enable Associated to close under the August 4, 1960, agreement, and asked whether the Estate of Carling Dinkler, Sr., would lend such amount to Associated. Counsel for the Dinklers, Mr. Spain, replied that he would not so advise the Executor because he did not consider it a proper loan for an executor to make. He stated that he would, and he did, introduce the officers of Associated to officers of the Commercial Department of Trust Company of Georgia. Negotiations followed in which counsel for the Dinklers did not participate. The Commercial Department of Trust Company of Georgia did lend to Robert K. Lifton, Ira J. Hechler and Howard Weingrow, the principal stockholders and officers of Associated, $2,000,000.00 on condition that the borrowers concurrently therewith loaned Associated $2,350,000.00 taking Associated's note therefor, which they then assigned to Trust Company of Georgia as security for its $2,000,000.00 loan to the stockholders and officers of Associated. The $2,000,000.00 loan was beyond the lending limits of Trust Company of Georgia, and in order to enable such loan to be made, Trust Company of Georgia, as Executor under the Will of Carling Dinkler, Sr., agreed to and did accept a $500,000.00 participation in the loan. The remainder of the

purchase money was obtained from other sources.

The negotiations for the foregoing loan were conducted by Messrs. Lifton, Hechler and Weingrow with the Commercial Department of the Trust Company of Georgia, and not with the Trust Department of the latter, which was acting as Executor of the Estate of Carling Dinkler, Sr.

Mr. Augustus H. Sterne, presently President of the Trust Company of Georgia, was the principal bank officer with the Commercial Department negotiating the loan. The Dinklers had transacted its banking business with the Trust Company of Georgia for many years and the bank had found this relationship profitable. The bank was interested in keeping these accounts when Associated Hotels completed its purchase of the Dinkler properties. In late 1960, Mr. Sterne traveled to New York and spoke with Messrs. Lifton, Hechler and Weingrow to encourage them to continue doing business with Trust Company of Georgia after the sale was consummated. This desire on the part of Trust Company of Georgia to have Associated continue the business relationship it had enjoyed over the years with Dinklers, was one of the compelling reasons why the bank agreed to arrange credit of $2,000,000.00 for Messrs. Lifton, Hechler and Weingrow. Eventually, the Commercial Department of the bank obtained a participation in the $2,000,000.00 loan granted to the extent said loan exceeded its legal loan limits. The bank would have loaned the entire amount itself without any participation, but for the legal loan limit.

Thereafter, on February 23, 1961, the August 4, 1960, agreement was amended by (1) allowing Dinkler-Tutwiler Corporation to sell the stock in Jefferson Davis Corporation, which the latter owned, with the price to be paid for the Dinkler-Tutwiler stock to be correspondingly increased, (2) Associated waiving any claim it might have on life insurance policies held by Dinkler Hotels, Inc., and Dinkler-Tutwiler Corporation on Carling Dinkler, Sr., in excess of a certain figure with a resulting price adjustment, and (3) providing the purchase price would be paid in checks not exceeding $6,215,-000.00, and the balance in demand notes. Item 2 of this amendment had already been agreed to by the parties by supplemental agreement dated August 4, 1960.

On the same date, the agreement as amended was consummated and the adjusted price of $3,539,948.00, representing the price of Dinkler-Tutwiler Corporation stock owned by Carling Dinkler, Sr., was paid to the Estate of Carling Dinkler, Sr.

In the fiduciary income tax return for the fiscal period ended June 30, 1961, the Executor reflected a basis for the Dinkler-Tutwiler Corporation stock of $3,539,948.00, which was the fair market value of the stock on January 30, 1961, the date of the death of Carling Dinkler, Sr. No gain was reported by the Executor on the fiduciary income tax return for the fiscal period nor by the beneficiaries of the estate (Mrs. Joel W. Dinkler and Carling L. Dinkler, Jr.) in their respective income tax returns for their taxable years ended December 31, 1961.

The Commissioner of Internal Revenue held that the proceeds from the sale of the Dinkler-Tutwiler stock constituted income in respect of a decedent under Section 691 of the Internal Revenue Code of 1954; and further held that a long term capital gain in the amount of $3,454,863.-56 was realized on the sale.

These deficiencies were paid in full by the respective parties and, after each party filed a claim for refund which were rejected, these actions, which have been consolidated for trial, were filed.

The question for determination by this Court is whether, under the facts and circumstances, any of the proceeds received by the Estate of Carling Dinkler, Sr., from the disposition of stock constitute income with respect to a decedent and thus taxable as determined by the Commissioner. The applicable provisions of

the statutes and Treasury Regulations are set forth in the following footnote: [2]

Were the proceeds from the sale of Dinkler-Tutwiler Corporation stock in-

2. Internal Revenue Code of 1954:
SEC. 691. Recipients of income in respect of decedents.
(a) *Inclusion in Gross Income.—*
(1) *General rule.*—The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period (including the right to receive such amount was acquired by reason of the death of the prior decedent or by bequests, devise, or inheritance from the prior decedent) shall be included in the gross income, for the taxable year when received, of:
(A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;
(B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or
(C) the person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the amount is received after a distribution by the decedent's estate of such right.
\* \* \* \* \* \* \*
(3) *Character of income determined by reference to decedent.*—The right, described in paragraph (1), to receive an amount shall be treated, in the hands of the estate of the decedent or any person who acquired such right by reason of the death of the decedent, or by bequest, devise, or inheritance from the decedent, as if it had been acquired by the estate or such person in the transaction in which the right to receive the income was originally derived and the amount includible in gross income under paragraph (1) or (2) shall be considered in the hands of the estate or such person to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount.
\* \* \* \* \* \* \*
(26 U.S.C.1964 ed., § 691.)
Treasury Regulations on Income Tax (1954 Code):
Sec. 1.691(a)–1. *Income in respect of a decedent.*
\* \* \* \* \* \* \*
(b) *General definition.*—In general, the term "income in respect of a decedent" refers to those amounts to which a decedent was entitled as gross income but

which were not properly includible in computing his taxable income for the taxable year ending with the date of his death or for a previous taxable year under the method of accounting employed by the decedent. See the regulations under section 451. Thus, the term includes—
(1) All accrued income of a decedent who reported his income by use of the cash receipts and disbursements method;
(2) Income accrued solely by reason of the decedent's death in case of a decedent who reports his income by use of an accrual method of accounting; and
(3) Income to which the decedent had a contingent claim at the time of his death.
\* \* \* \* \* \* \*
(26 C.F.R., Sec. 1.691(a)–1.)
Sec. 1.691.(a)–2. *Inclusion in gross income by recipients.*
(a) Under section 691(a) (1), income in respect of a decedent shall be included in the gross income, for the taxable year when received, of—
(1) The estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;
(2) The person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or
(3) The person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the amount is received after a distribution by the decedent's estate of such right.
These amounts are included in the income of the estate or of such persons when received by them whether or not they report income by use of the cash receipts and disbursements method.
\* \* \* \* \* \* \*
(26 C.F.R., Sec. 1.691(a)–2.)
Sec. 1.691(a)–3. *Character of gross income.*
(a) The right to receive an amount of income in respect of a decedent shall be treated in the hands of the estate, or by the person entitled to receive such amount by bequest, devise, or inheritance from the decedent or by reason of his death, as if it had been acquired in the transaction by which the decedent (or a prior decedent) acquired such right, and shall be considered as having the same character it would have had if the de-

come to Mr. Dinkler, Sr., and taxable as such? The plaintiffs contend that no sale had occurred prior to Mr. Dinkler, Sr.'s, death, and thus the proceeds were not taxable. The Government asserts that the transaction was completed by Mr. Dinkler, Sr., prior to his death, and that all that remained was the closing and payment, and that the income was entirely generated by Mr. Dinkler, Sr.'s, activities and constitutes income in respect of the decedent, Mr. Dinkler, Sr.

Section 691 of the Internal Revenue Code of 1954 provides for taxation of income in respect of decedents. Section 691(a) (1) provides, as a general rule, that the amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period shall be included in the gross income, for the taxable year when received, of (A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent; (B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or (C) the person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the amount is received after a distribution by the decedent's estate of such right.

Section 691(a) (3) relates to the character of income, and it provides that the right, described in paragraph (1), to receive an amount shall be treated, in the hands of the estate of the decedent or any person who acquired such right by reason of the death of the decedent, or by bequest, devise, or inheritance from the decedent, as if it had been acquired by the estate or such person in the transaction by which the decedent acquired such right; and the amount includible in gross income shall be considered in the hands of the estate or such person to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount.

Section 691(c) provides that a person who includes an amount in gross income under subsection (a) shall be allowed a deduction with respect to the estate tax attributable to the item, and it further provides the method of computing the deduction. There is no question as to this in the instant cases, and it is unnecessary to consider it here.

The applicable Regulations (Treasury Regulations, Sec. 1.691(a)–3) contain the following provisions:

(a) The right to receive an amount of income in respect of a decedent shall be treated in the hands of the estate, or by the person entitled to receive such amount by bequest, devise, or inheritance from the decedent or by reason of his death, as if it had been acquired in the transaction by which the decedent (or a prior decedent) acquired such right, and shall be considered as having the same character it would have had if the decedent (or a prior decedent) had lived and received such amount. * * *

* * * * * *

(b) * * *

(1) If the income would have been capital gain to the decedent, if he had lived and had received it, from the sale of property held for more than 6

cedent (or a prior decedent) had lived and received such amount. The provisions of section 1014(a), relating to the basis of property acquired from a decedent, do not apply to these amounts in the hands of the estate and such persons. See section 1014(c).

(b) The application of paragraph (a) of this section may be illustrated by the following:

(1) If the income would have been capital gain to the decedent, if he had lived and had received it, from the sale of property held for more than 6 months, the income when received, shall be treated in the hands of the estate or of such person as capital gain from the sale of the property, held for more than 6 months, in the same manner as if such person had held the property for the period the decedent held it, and had made the sale.

* * * * * * *

(26 C.F.R., Sec. 1.691(a)–3.)

months, the income when received, shall be treated in the hands of the estate or of such person as capital gain from the sale of the property, held for more than 6 months, in the same manner as if such person had held the property for the period the decedent held it, and had made the sale.

The legislative history of Section 691 is outlined by Chief Judge Jones in the Court of Claims opinion in the case of Davison's Estate v. United States, 292 F.2d 937, 155 Ct.Cl. 290 (1961). We may summarize this history as follows:

Section 42 of the Revenue Act of 1934, c. 277, 48 Stat. 680, required all income accrued up to the date of death, not otherwise properly includible for such period or a prior period, to be included in the income tax return of a decedent for the period in which fell the date of his death. The provision was enacted because the courts had held under prior law that income accrued before death but received by the estate was not income to the estate but a part of the corpus. Hence, prior to this provision of the Revenue Act of 1934 neither the estate nor the decedent ever paid income tax on such amounts. Similarly, in the case of capital transactions as here, no income would be payable to the estate even when the actual transfer took place after death. This resulted from the fact that the estate's basis in such assets would be their fair market value at the date of death, and hence there would be no capital gain since such value would equal the sale price.

This provision of the Revenue Act of 1934 required the inclusion of the value of services rendered, whether based on agreed compensation or on *quantum meruit*, in decedent's final return as accrued income. Helvering v. Enright's Estate, 312 U.S. 636, 61 S.Ct. 777, 85 L.Ed. 1093. In some instances, such treatment resulted in hardship as, quite frequently, amounts which would have been received over a number of years were returnable in the year of death, thus carrying the income into higher brackets due to the bunching of such income.

To alleviate such hardship, Section 126 of the Code was added to the 1939 Code by Section 134 of the Revenue Act of 1942, c. 619, 56 Stat. 798, to provide that income accruing to a decedent because of his death was not includible in his final return, but was to be treated as income and reported as income by the one receiving the right to such income. Such treatment was for the express purpose of alleviating a hardship and, at the same time, preventing certain income from escaping taxation, as above described. Eventually, Section 126 was reenacted as Section 691 of the Internal Revenue Code of 1954, without material change.

In the cases under consideration, the estate of Carling Dinkler, Sr., received $3,539,948.00 when the transaction provided for in the August 4 agreement was formally closed on February 23, 1961. Certain distributions had been made to Mrs. Joel W. Dinkler and Carling Dinkler, Jr. Thus, the application of Section 691 to the transaction involved rendered it necessary to assess deficiency taxes against each of the three parties to these actions.

▇ Although Congress failed to specifically define precisely what income in respect of a decedent is, this Court feels that it is clear that the intent of Congress was, as stated in Helvering v. Enright's Estate, supra, "to cover into income the assets of decedents, earned during their life and unreported as income". This section covers income from all sources, including capital gains such as in the instant case. The purpose of Section 691 and its predecessor sections was to reduce the importance of death in the actual collection of the revenue.

▇▇ Thus, there is no doubt that the plaintiffs acquired the right to receive the amounts from the sale of the Dinkler-Tutwiler stock from Carling Dinkler, Sr., and, under Section 691(a) (3), that right is to have the same character in the hands of the plaintiffs which it would have had in the hands of Carling Dinkler, Sr. The

cases have held consistently that the criterion of taxability of income as income in respect of a decedent is whether the post-death payments are in fact due to the services performed by or economic activities of the decedent. Grill v. United States, 303 F.2d 922, 157 Ct.Cl. 804; Davison's Estate v. United States, 292 F.2d 937, 155 Ct.Cl. 290; United States v. Ellis, 2 Cir., 264 F.2d 325; Riegelman's Estate v. Commissioner of Internal Revenue, 2 Cir., 253 F.2d 315; Commissioner of Internal Revenue v. Linde, 9 Cir., 213 F.2d 1, cert. den. 348 U.S. 871, 75 S.Ct. 107, 99 L.Ed. 686; Bernard v. United States, D.C., 215 F.Supp. 256. Payments are taxable under Section 691 even though realized after the decedent's death when such payments arise from contracts, arrangements, or deals made by the decedent and would have been income to the decedent. Levin v. United States, D.C., 254 F.Supp. 640 (1966).

In the cases at hand, both the plaintiffs and the defendant strongly rely upon the case of Commissioner of Internal Revenue v. Linde, supra. In the *Linde* case, the decedent had negotiated for the disposition of his grapes and no substantial activity was required of his estate in order to produce the income, and the Court found in the *Linde* case that the payments in issue were income in respect of a decedent. There the decedent had delivered grapes to various cooperatives of which he was a member, and the latter commingled all members' grapes in a "wine pool". The grapes in such pool were crushed, processed into wine, the wine sold, expenses deducted from the wine proceeds, and each member's share of the proceeds thereafter was distributed to the member by the cooperatives. The Court held that the proceeds from the "wine pool" received after decedent's death by his beneficiary where the grapes had been delivered before death constituted income in respect of a decedent. In so holding, the Court expressly noted that it was not necessary to establish a sale by the decedent during his lifetime.

In ruling that Section 126, the predecessor section of Section 691, applied, the Court in Linde stated, referring to the decision in O'Daniel's Estate v. Commissioner of Internal Revenue, 2 Cir., 173 F.2d 966:

"We think that the text of section 126 as well as the history of the legislation relating to the income of a decedent demonstrate the soundness of the O'Daniel decision and that the principles there expressed must be applied in the instant case. If the decedent had lived until the day when these crop pool proceeds were paid to him the payments so received would have been ordinary income. Sec. 126 itself contains strong evidence of congressional intent to see to it that the tax upon income which would have been derived had the decedent lived should not be lost to the treasury in consequence of his death. Thus subparagraph (3) of section 126(a) provides that 'the amount includible in gross income under paragraph (1) * * * shall be considered in the hands of the estate or such person to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount.' The payments which the taxpayer received in 1945 were realized under and in consequence of contracts and deals made by the decedent in his lifetime. No act or thing taken or performed by the taxpayer operated to procure or to give rise to this payment. Such payments had their source exclusively in the decedent's contract and arrangement with the cooperative associations. And since in his hands had he lived and received these amounts they would have had the character of ordinary income, the quoted provision of subdivision (3) would make it appear that they have the same character, that is, ordinary income, in the hands of this taxpayer who acquired the right to receive that amount by bequest from the decedent within the meaning of subdivision (C) of subparagraph (1) of section 126 (a)."

In the cases at hand, the payment received by the estate of Carling Dinkler, Sr., on February 23, 1961, the date of the

closing of the August 4, 1960, agreement, was realized as a consequence of negotiations and agreement made by Mr. Carling Dinkler, Sr., during his lifetime. It was his economic activity leading up to and including the signing of the August 4 agreement which produced the income now in dispute. There were no acts of any consequence taken or performed by the estate of Mr. Dinkler, Sr., which operated to procure or give rise to the payments involved. Such payments were the direct result of the efforts of Carling Dinkler, Sr., and nothing of substance remained to be performed after his death except the formal closing.

The evidence submitted reveals that the Dinklers had, prior to Mr. Dinkler, Sr.'s, death, accomplished all the matters needed to be performed by them to effect the closing. On the date of his death, Carling Dinkler, Sr., had only to await the date of the closing to receive the sums due under the contract of sale which he had negotiated prior to his death. The stock had been placed in escrow to await payment of the purchase price; Mr. Dinkler, Sr., was contractually bound to sell it to these particular purchasers and was not free to sell it to any other persons. The moneys eventually received by his estate at the closing were not due to any economic activity of the estate. The estate's right to the purchase price was due solely to the death of the decedent. The matters in which the estate participated and by which the closing was consummated were merely perfunctory and of no material significance.

The plaintiffs contend that (1) the August 4 agreement was an option in favor of Associated, the purchasers; (2) by the date of death, Carling Dinkler, Sr., had not made a disposition by sale or other arrangement of the stock in issue; (3) all of the conditions of the agreement had not been met by the date of Dinkler's death and performance of the management contract was rendered impossible by his death; (4) nothing was owed Carling Dinkler, Sr., at the time of his death; and (5) the sale of the stock was made pursuant to an amended agreement resulting from the efforts of the estate.

██ Initially, the August 4 agreement was not an option to purchase in favor of Associated. Ordinarily, where someone grants another an option to purchase, he retains control over the subject matter of the option until such time as the option is exercised and the sale is completed. In this case, the subject of the contract, namely, the stock, was placed beyond the dominion and control of Dinkler with Frank Spain, the Escrow Agent. This agreement was similar to the everyday type of agreement to sell real estate whereby the seller's only remedy, if the purchaser defaults, is to obtain the difference between the fair market value of the property at the time of the default and the contract price, for the seller is not free to dispose of the property to a third party until such default has occurred. Here, Carling Dinkler, Sr., would have had a similar remedy, except that, under the agreement, the parties agreed as to the amount of liquidated damages in advance, namely, the forfeiture of the earnest money.

The plaintiffs' second contention is that no sale or other disposition had occurred by the date of Mr. Dinkler's death. It is true that no sale of the stock had occurred; however, a significant disposition of the stock had been accomplished because months before the date of Mr. Dinkler's death, in performance of his contract, he had placed the stock in escrow, and thus beyond his control. So there had occurred, by decedent's death, a disposition similar to what had occurred in the case of Commissioner of Internal Revenue v. Linde, supra, and, as noted by the Court in Linde, it was not necessary that there be a sale to establish income in respect of a decedent.

It is true that all of the conditions of the contract of August 4, 1960, had not been met by the date of Mr. Dinkler's death; however, those that remained unfulfilled have no material effect on these cases, as indeed they could not have been fulfilled until the closing date by the very nature of the contract itself. Many

of these conditions precedent by their very nature were required to be performed on the day of closing.[3] Also, the management contract has no significant bearing since the evidence shows that by the date of decedent's death, the purchasers were not wedded to management by Carling Dinkler, Sr.

At the time of Mr. Dinkler's death, nothing was actually owed under the contract; however, he did possess a valuable right, namely, the right to the proceeds at the closing in accordance with the terms negotiated by him. It is this right to the proceeds which the estate acquired solely as a result of decedent's death, and not by virtue of any economic activity of the estate.[4]

The many diverse characteristics in the various cases dealing with this statute do not permit an easy generalization, and we cannot draw from them a rule as to what is income in respect of a decedent in all cases. It is fair to say, however, in light of the development of the statute, that each of these characteristics represents an element in the composite concept that is income in respect of a decedent.

When the facts in these cases are all viewed, it is readily apparent that the proceeds in issue were realized as a consequence of negotiations and an enforceable contract made by Mr. Dinkler, Sr., during his lifetime, and not the result of any material acts or activities by the estate. The right to the proceeds was acquired by the plaintiffs solely by virtue of the death of the decedent and not through their own efforts. Had Mr. Dinkler lived through the closing date, the proceeds would have been income to him and, consequently, they constitute income in respect of a decedent when received by the estate. Accordingly, the action of the Commissioner in taxing these proceeds as such was proper.

This opinion is adopted by the Court as the Findings of Fact and Conclusions of Law as provided by Rule 52(a), Federal Rules of Civil Procedure.

Judgment will be entered in each of these cases dismissing the complaints with prejudice and allowing the defendant his costs.

3. The consent of the mortgagee was to be obtained by the purchasers, and the liquidation of Dinkler Hotels Company, Inc., together with the merger of Belvedere Corporation were likewise to be accomplished on or after the date of the closing.

4. The participation by the estate in the loan made by the Trust Company of Georgia to Associated merely facilitated to some degree the closing of the contract negotiated by the decedent. The manner and method utilized by Associated, the purchasers, in assembling the necessary funds do not affect the rights of the parties to the contract as they existed on the date of death.