ESTATE OF ERNEST G. NAPOLITANO, DECEASED, THE FIRST NATIONAL BANK OF LONG ISLAND AND MOLLY DONOVAN, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Napolitano v. Commissioner
Docket No. 23168-89
United States Tax Court
T.C. Memo 1992-316; 1992 Tax Ct. Memo LEXIS 340; 63 T.C.M. (CCH) 3092; June 4, 1992, Filed *340 Decision will be entered under Rule 155. James M. Marrin and Jed C. Albert, for petitioner. Diane R. Mirabito, for respondent. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined a deficiency of $ 11,938 in petitioner's income tax for its taxable year ended March 31, 1986. At the time the petition in this case was filed, petitioner's legal address was in care of The First National Bank of Long Island in Woodbury, New York. The case was submitted on the basis of a stipulation of facts and exhibits. The decedent, Ernest G. Napolitano (sometimes referred to as Dr. Napolitano), had entered into a contract for the sale of certain real property owned by him, but the sale was not consummated until after his death. At issue is whether, in the circumstances of this case, the gain on sale, which would have been chargeable to decedent had the sale been completed during his lifetime, must be recognized by petitioner, his estate, as income in respect of a decedent pursuant to section 691(a). [1]
*341 In 1972, decedent purchased the premises at 86-18 Jamaica Avenue in Woodhaven, New York (the Jamaica Avenue property or simply the building or the property), for $ 25,568. On April 8, 1985, he entered into a contract to sell the Jamaica Avenue property to Marie Scarprinito (Ms. Scarprinito or the buyer). The contract provided for a total purchase price of $ 100,000, with $ 10,000 of that amount payable on the signing of the contract. Other pertinent portions of the contract are as follows: 4. The PREMISES are to be transferred subject to: a. Laws and governmental regulations that affect the use and maintenance of the PREMISES, provided that they are not violated by the buildings and improvements erected on the PREMISES. b. Consents for the erection of any structures on, under or above any streets on which the PREMISES abut. c. Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway. d. Any state of facts an accurate survey may show provided same does not render title unmarketable. e. Covenants, easements and restrictions of record provided same are not violated by present structures or use. * * * 7. CLOSING will take *342 place at the office of Seller's attorney or lending institution at 10:AM o'clock on or about June 3, 1985 * * * 11 a. SELLER will comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by any governmental department having authority as to lands, housing, buildings, fire, health and labor conditions affecting the PREMISES at the date hereof. The PREMISES shall be transferred free of them at CLOSING * * *. SELLER shall furnish PURCHASER with any authorization necessary to make the searches that could disclose these matters. * * * 20. If SELLER is unable to transfer title to PURCHASER in accordance with this contract, SELLER'S sole liability shall be to refund all money paid on account of this contract * * * [plus certain other amounts expended by the purchaser]. Upon such refund and payment this contract shall be considered cancelled, and neither SELLER nor PURCHASER shall have any further rights against the other. 21. PURCHASER has inspected the buildings on the PREMISES and the personal property included in this sale and is thoroughly acquainted with their condition. PURCHASER agrees to purchase them *343 "as is" and in their present condition subject to reasonable use, wear, tear, and natural deterioration between now and CLOSING.* * * A rider attached to the contract provided in part that the down payment would be held in escrow until the closing by Payne, Wood & Littlejohn, counsel to decedent. At some point prior to May 9, 1985, a violation search request was apparently made to the New York City Office of Rent and Housing Maintenance with respect to the Jamaica Avenue property. The response to this request stated that "A Search of the Housing Department Records indicated the following violations", and further stated "See attached for pending violations as per search dated 05/07/85". The attached form provided as follows: HOUSING VIOLATIONS
ITEM * * *
DATE
DESCRIPTION
6P * * *
4-27-76
REPAIR PLASTERED SURFACES AND PAINT CEILING
OF REAR BEDROOM 2 STY REAR APT     8P * * *
4-27-77
PAINT WALLS AND CEILINGS ALL ROOMS 2 STY APT
9P * * *
4-28-77
ABATE THE NUISANCE OF VERMIN ROACHES 2 STY
REAR APT ALL ROOMS
In a letter dated May 17, 1985, Beverly J. Bell, an attorney in the office of decedent's counsel, [2] wrote to the Chief Inspector of the New York City *344 Housing Authority (the Inspector) regarding the violations listed in the table in the preceding paragraph. In this letter, Ms. Bell stated that Dr. Napolitano had assured her that "the conditions have been corrected". The letter further stated that "Dr. Napolitano * * * requests a reinspection at your earliest possible convenience, as a closing on this property is imminent." Decedent died on June 2, 1985. The parties have stipulated that "Decedent's adjusted basis in the premises in issue is $ 11,040." Following decedent's death, Ms. Bell wrote a second letter to the Inspector, dated June 28, 1985, in which she informed the Inspector that: A reinspection was done by your department on May 24, 1985. It is my understanding that after this inspection was made, a card reporting the findings was mailed to Dr. Napolitano. We have been unable *345 to locate this card, and write at this time to request a duplicate be sent to me at the above address. This sale is expected to close within the next two weeks, and we will need notification of the disposition of these violations before the date of closing, therefore, I would appreciate your prompt attention to this matter. Included in the record is a photocopy of a card that is undisputedly a duplicate of the card referred to in Ms. Bell's letter. It was dated May 30, 1985, and indicated that violations "1P thru 5P-7P-9P-10P" had "been dismissed and removed from the records of this department." But this duplicate card also indicated that violations "6P-8P" had not been "complied with". An attorney representing Ms. Scarprinito, the buyer of the Jamaica Avenue property, wrote a letter to Ms. Bell dated July 24, 1985, in which the attorney stated: This is to advise you that I have discussed the violations problem with my clients' [sic] husband and have been advised that neither he or his son had agreed to close title subject to the violations. [3]
*346 I can appreciate your clients [sic] position however at the present time I must insit [sic] that either all of the violations of record be removed prior to closing of title and or in the alternative a monetary adjustment be made to my client. In which event we will close title with an escrow and remove the violation after closing of title. The parties have stipulated that in response to this letter, petitioner's counsel spent approximately 3 hours negotiating a final settlement of the violations. As a result of these negotiations, the buyer agreed to accept title to the property with the violations outstanding in return for a $ 2,250 reduction in the purchase price. The closing of the sale occurred on July 30, 1985. In the notice of deficiency, the Commissioner determined that "the long-term capital gain of $ 88,960.00, that you received from the sale of real property located at 86-18 Jamiaca [sic] Avenue, Woodhaven, New York, was not reported on your income tax return." The Commissioner also determined that petitioner was entitled to certain deductions provided in sections 691 and 1202. The dispute herein turns initially on the amount of basis that petitioner may use to *347 offset the proceeds it received from the sale of the building. Section 1014(a) provides in pertinent part that the basis of property in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent shall * * * be (1) the fair market value of the property at the date of the decedent's death * * * However, section 1014(c) excepts from this general rule "property which constitutes a right to receive an item of income in respect of a decedent under section 691." Pertinent portions of section 691 are set forth in the margin. [4]Section 691(a) provides in part that an amount of gross income "in respect of a decedent" that is not properly includable in any taxable year of the decedent [5] must be included in the estate's gross income if the estate acquires from the decedent the right to receive the amount. *348 The Government contends that the gain that decedent would have realized had the sale been consummated before his death was "income in respect of a decedent" within section 691 and taxable as such to petitioner upon receiving the proceeds of sale thereafter. Petitioner, on the other hand, argues that decedent's contract with the buyer was subject to certain conditions that were not satisfied at the time of decedent's death, and that such unfulfilled conditions prevented treating as income in respect of a decedent under section 691 the gain that would have been chargeable to decedent if he had completed the sale prior to his death. For reasons set forth hereinafter we agree with petitioner. In describing the purpose of the predecessor of section 691, [6] the Court in Commissioner v. Linde, 213 F.2d 1 (9th Cir. 1954), remanding 17 T.C. 584 (1951), stated that the intent of Congress in enacting the provision was to "'cover into income the assets of decedents, earned during their life and unreported as income'". Commissioner v. Linde, supra at 5, (quoting Helvering v. Estate of Enright, 312 U.S. 636, 644-645 (1941)). *349 While the Code does not define the term "income in respect of a decedent", section 691(a)(1) makes it clear that a "right" to receive an amount must have been acquired from the decedent in order for the amount to be income in respect of a decedent. Estate of Peterson v. Commissioner, 667 F.2d 675, 679 (8th Cir. 1981), affg. 74 T.C 630 (1980); Keck v. Commissioner, 415 F.2d 531, 534-535 (6th Cir. 1969), revg. 49 T.C. 313 (1968); Trust Company of Georgia v. Ross, 392 F.2d 694, 695 (5th Cir. 1967), affg. 262 F.Supp. 900 (N.D. Ga. 1966); Sec. 1.691(a)-1(b), Income Tax Regs. By contrast, if an estate acquires a "mere expectancy" from the decedent, then any amounts received pursuant to that expectancy do not constitute "income in respect of a decedent." Estate of Peterson v. Commissioner, 74 T.C 630, 639-640 (1980), affd. 667 F.2d 675 (8th Cir. 1981). Thus, the ultimate issue in this case, narrowly stated, is whether the property that was transferred to petitioner on decedent's death consisted of the Jamaica Avenue property, or of the right *350 to receive the proceeds from the sale of the property. In order for a sale of property to have ripened to the point where a decedent has the right to the proceeds of that sale on the date of his death, at least two conditions must be satisfied. [7] First, "the decedent must have entered into a legally significant arrangement, e.g., a contract, regarding the disposition of the subject matter of the sale." Estate of Peterson v. Commissioner, supra at 639; cf. Estate of Sidles v. Commissioner, 65 T.C. 873, 887-888 (1976) (Hall, J., concurring in the result), affd. without published opinion 553 F.2d 102 (8th Cir. 1977). *351 Second, the decedent must have "performed the substantive (nonministerial) acts required of him as preconditions to the sale, i.e., the subject matter of the sale was in a deliverable state on the date of the decedent's death." Estate of Peterson v. Commissioner, supra at 640. In the present case, decedent's contract to sell the Jamaica Avenue property constituted a legally significant relationship regarding the disposition of that property. However, as of the date of his death, decedent had not performed all of the substantive acts required as prerequisites to the sale, and the property was not in a "deliverable state". The contract of sale required decedent to transfer the building free of "all notes or notices *352 of violations of law or municipal ordinances, orders or requirements noted in or issued by any governmental department having authority as to lands, housing, buildings, fire, health and labor conditions affecting the PREMISES at the date hereof." This contractual provision remained unfulfilled as of the date of decedent's death, because the housing violations described above as "6P" and "8P" had not been corrected at that time. Thus, decedent had not placed the building in a deliverable state on the date of his death. It is true that a decedent may be held to have the right to the proceeds of a sale despite the fact that he had not completed every act required of him by the contract on the date of his death. See Estate of Sidles v. Commissioner, supra at 881; However, in order for such proceeds to constitute income in respect of a decedent, the only remaining acts must be "ministerial" rather than "substantive". See Estate of Peterson v. Commissioner, supra at 640; Estate of Sidles v. Commissioner, supra at 881; Trust Company of Georgia v. Ross, 262 F.Supp. 900, 909 (N.D. Ga. 1966), affd. *353 392 F.2d 694 (5th Cir. 1967). The letter written by the buyer's attorney indicated that the buyer would not agree to accept title unless the housing violations were cured or an adjustment in the purchase price were made. It then had to be decided whether petitioner would remedy the violations or would instead attempt to persuade the purchaser to accept title to the building notwithstanding the violations. After the latter course was chosen, Ms. Bell negotiated with the buyer, presumably in an attempt to persuade the buyer to accept as small a reduction in the purchase price as possible. In our view, this type of decision-making and negotiating demanded judgment and discretion, and cannot be considered "ministerial", perfunctory, routine, or insubstantial. Because one of the substantive prerequisites to the sale remained uncompleted at the time of decedent's death, he did not have a right or entitlement to the proceeds. Compare Estate of Sidles v. Commissioner, supra at 881. Accordingly, the proceeds of that sale are not income in respect of the decedent. To be sure, Ms. Bell's negotiations did not result in a large reduction in the purchase *354 price of the building. Nevertheless, the reduction was neither negligible nor insignificant. But what matters more than the dollar amount of the reduction in the purchase price is the nature of the acts that petitioner was required to perform following the decedent's death. If one or more of those acts are not "ministerial", then the decedent had no right to the proceeds of the sale, and those proceeds are not income in respect of a decedent. See Estate of Peterson v. Commissioner, 74 T.C. 630, 640 (1980), affd. 667 F.2d 675 (8th Cir. 1981); Trust Co. of Georgia v. Ross, supra at 909. We hold for petitioner on this issue. We have considered other contentions made by the parties, and have determined that it is unnecessary to discuss them. To reflect the foregoing, and a concession made by petitioner, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The record does not disclose her status in that office, i.e., as partner, associate, etc. However, it is undisputed that she was acting on behalf of decedent as his attorney.↩
3. The record does not indicate why the attorney had been discussing the matter with the buyer's husband and son. However, there is no dispute that they were acting on the buyer's behalf and that their position may properly be considered as attributable to her.↩
4. SEC. 691. RECIPIENTS OF INCOME IN RESPECT OF DECEDENTS. (a) General Rule. (1) General rule. -- The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period * * * shall be included in the gross income, for the taxable year when received, of: (A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent; * * * (3) Character of income determined by reference to decedent. --The right, described in paragraph (1), to receive an amount shall be treated, in the hands of the estate of the decedent * * * as if it had been acquired by the estate * * * in the transaction in which the right to receive the income was originally derived and the amount includible in gross income under paragraph (1) or (2) shall be considered in the hands of the estate * * * to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount. ↩
5. Neither party contends that the proceeds of the sale were properly includable in any of decedent's taxable years. Furthermore, there is no dispute that if the proceeds from the sale of the building were income in respect of a decedent, then they were long-term capital gain to the estate, since they would have been long-term capital gain to the decedent if he had lived to receive them. See sec. 691(a)(3)↩.
6. The history of section 691 and its predecessor is set forth in numerous cases. E.g., Keck v. Commissioner, 415 F.2d 531, 533 (6th Cir. 1969), revg. on other grounds 49 T.C. 313 (1968); Estate of Sidles v. Commissioner, 65 T.C. 873, 878-879 (1976), affd. without published opinion 553 F.2d 102↩ (8th Cir. 1977).
7. Estate of Peterson v. Commissioner, 74 T.C 630, 639-641 (1980), affd. 667 F.2d 675↩ (8th Cir. 1981), sets forth further requirements, but the manner in which we dispose of this case does not require us to consider such additional requirements.